8 N.J. Super. 71 (1950)
73 A.2d 262
EUGENIO ABLONDI, ET AL., APPELLANTS,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY OF THE STATE OF NEW JERSEY, AND HERMAN BASCH & CO., INC., RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 1, 1950.
Decided May 16, 1950.
*73 Before Judges JACOBS, DONGES and BIGELOW.
Mr. Aaron A. Melniker argued the cause for the appellants.
Mr. Clarence F. McGovern argued the cause for the respondent Board of Review, Division of Employment Security, Department of Labor and Industry.
Mr. Harry Clyne, of the New York Bar, argued the cause for the respondent Herman Basch & Co., Inc. (Mr. Harvey Bein, attorney).
The opinion of the court was delivered by JACOBS, S.J.A.D.
This is an appeal from a determination by the Board of Review that the appellants were disqualified under the provisions of R.S. 43:21-5(d) from receiving unemployment compensation.
The respondent Herman Basch & Co., Inc., is engaged in the business of dressing, dyeing and processing fur skins *74 owned by its customers. It operates a plant at North Bergen, New Jersey, where the appellants, who are members of Fur Dressers' Union Local No. 2 or Fur Floor Workers' Union Local No. 3, were employed. Several weeks are required to process the skins and once processing is started, it must be completed in regular course to avoid spoilage. When the plant is operating in normal manner there are in excess of 200,000 skins being processed.
In 1946 the employer and the unions entered into collective bargaining contracts which expired under their terms on April 30, 1948. These contracts provided that on or about February 15, 1948, the parties shall meet for the purpose of discussing their renewal, revision or modification. Early in February. 1948, the unions sent letters to the employer embodying demands for wage increases and other benefits in proposed contracts for the period commencing May 1, 1948. Thereafter, negotiations were conducted between the employer and the unions and conferences were held, mostly in New York City, during which the unions presented their demands and the employer presented counter demands. On March 1, 1948, the unions addressed formal sixty-day notices under the Labor Management Relations Act, 1947 (29 U.S.C.A., § 158) stating they proposed terminating their collective bargaining agreements and requesting that the terms of the new contracts be negotiated. Thereafter the conferences between the parties were continued but produced no agreement.
Dr. Nauen, vice-president and secretary in charge of operations of the employer's plant, testified that about the middle or end of March it was apparent it would be difficult to reach agreements with the unions and the company began curtailing its production. Mr. Vort, president of the employer, testified there were numerous meetings with union representatives in February, March and thereafter, they were unable to reach agreements and in March "we stopped taking skins until we knew where we stood." By the close of March the skins in process had been reduced to approximately 20,000 and it was evident, as the Board of Review found, that there *75 had been "a substantial curtailment of production." The employer had apparently determined that it would not undertake extensive processing, with the risk of spoilage in the event of sudden cessation of work, until contracts for the period commencing May 1, 1948, had been executed. As the volume of skins processed was reduced the earnings of the members of the unions were correspondingly reduced. About the beginning of April the employer started to lay off the employees and not many members of the unions remained at work when the contracts expired on Friday, April 30, 1948. None of the members reported for work on Monday, May 3, 1948, although, with minor exceptions, they did not remove their tools or work clothes from the plant.
No further negotiations between the employer and the unions were conducted until a conference was called on May 10th by the United States Conciliation Service. Thereafter negotiations were continued until June 15, 1948, on which date memorandum agreements were reached. The employees resumed work between June 15th and June 30, 1948. The Board of Review found that, although the employer had been diligent in obtaining additional furs for processing "a considerable number of employees could not be recalled until June 30, 1948, the first date on which substantial production was resumed." The Board concluded that each of the appellants was disqualified from unemployment compensation for the period prior to June 30, 1948, on the ground that his unemployment was "due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed." See R.S. 43:21-5(d).
We are not concerned with the wisdom or unwisdom of the labor dispute disqualification clause of our Unemployment Compensation Law; the important policy determination rests entirely with the Legislature. Our judicial function is confined to the interpretation and application of the comprehensive legislative phraseology in the light of its history, purpose and context. It was taken from the Social Security *76 Board Draft Bill and is found, in identical language, in the laws of many of the States. See Fierst and Spector, Unemployment Compensation in Labor Disputes, 49 Yale L.J. 461 (1940); Sakrison v. Pierce, 66 Ariz. 162, 185 P.2d 528, 173 A.L.R. 480 (Sup. Ct. 1947). It has been said to place the State in a completely neutral position without regard to the rightness or reasonableness of the positions or demands of the employer or the employees. In re Steelman, 219 N.C. 306, 13 S.E.2d 544 (Sup. Ct. 1941); Fash v. Gordon, 398 Ill. 210, 75 N.E.2d 294 (Sup. Ct. 1947). Apart from exceptions not pertinent here, if there was a "labor dispute" at the premises and as a result thereof there was a "stoppage of work" causing the unemployment the disqualification, under its express terms, applied. See Midvale Co. v. Unemployment Compensation Board of Review, 165 Pa. Super. 359, 67 A.2d 380 (1949). Cf. Aitken v. Unemployment Compensation Commission, 136 N.J.L. 372, 374 (Sup. Ct. 1947).
Definition of the term "labor dispute" is found in other labor enactments but not in the Unemployment Compensation Law. Cf. R.S. 2:29-77.8; Kohn v. Local No. 195, 132 N.J. Eq. 512 (Ch. 1942). However, courts have given weight to such legislative definition and have held that the term broadly includes any controversy concerning terms or conditions of employment or arising out of the respective interests of employer and employee. See Miners in General Group v. Hicks, 123 W. Va. 637, 17 S.E.2d 810 (Sup. Ct. 1941); Adkins v. Indiana Employment Security Division, 117 Ind. App. 132, 70 N.E.2d 31 (1946). Lockouts as well as strikes have been included. In re North River Logging Co., 15 Wash.2d 204, 130 P.2d 64 (Sup. Ct. 1942); Adkins v. Indiana Employment Security Division, supra; Fierst and Spector, supra. at p. 479. Cf. R.S. 43:21-5(c) (2) (a).
The term "stoppage of work" refers generally to a cessation of plant operations. Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, 308 Mich. 198, 13 N.W.2d 260, 154 A.L.R. 660 (Sup. Ct. 1944); cert. den., *77 323 U.S. 738, 89 L.Ed. 591 (1944); Magner v. Kinney, 141 Neb. 122, 2 N.W.2d 689 (Sup. Ct. 1942); Fierst and Spector, supra, at p. 483. It has been recognized, however, that the stoppage need not be complete and that it will suffice if there has been a substantial curtailment of operations. Midvale Co. v. Unemployment Compensation Board of Review, supra; Magner v. Kinney, supra. Cf. Carnegie-Illinois Steel Corp. v. Review Board of Indiana Employment Security Division, 117 Ind. App. 379, 72 N.E.2d 662 (1947); Fash v. Gordon, supra. It has similarly been recognized that the stoppage and resulting disqualification do not end until there has been a resumption of normal operations even though there has been an earlier termination of the labor dispute. Saunders v. Maryland Unemployment Compensation Board, 188 Md. 677, 53 A.2d 579 (Ct. of App. 1947); American Steel Foundries v. Gordon, 404 Ill. 174, 88 N.E.2d 465 (Sup. Ct. 1949); Carnegie-Illinois Steel Corp. v. Review Board of Indiana Employment Security Division, supra.
We see no reason for departing from the foregoing principles. They represent interpretations, generally accepted both administratively and judicially, of the legislative contemplation in the passage of a uniform statutory provision. In some states individual interpretations have been modified by special legislative amendments (Midvale Co. v. Unemployment Compensation Board of Review, supra); in New Jersey, however, there has been no legislative action to that end although R.S. 43:21-5 has been amended in other respects. See P.L. 1945, c. 73, p. 365; P.L. 1945, c. 308, p. 891. Cf. Lesser, Labor Disputes in Unemployment Compensation, 55 Yale L.J. 167, 179 (1945). It may be noted that during the current session of the New Jersey Legislature, several bills embodying proposed amendments of R.S. 43:21-5(d) were introduced. See S. 117, A. 89, A. 145 and A. 199. A. 145 sought to restrict the statutory disqualification clause to strikes and S. 117 and A. 89 sought to exclude from its terms instances where the labor dispute "was commenced, instituted, occasioned or prolonged by a lockout or by any other act of his *78 employer or of a person acting on behalf or in the interest of his employer whereby he is refused permission to work or is otherwise prevented from engaging in his customary occupation or employment at such factory, establishment or other premises." None of the proposed amendments has been enacted into law.
Applying the aforestated principles to the facts in the instant matter, we have reached the conclusion that the appellants were properly disqualified from benefits for the entire period prior to June 30, 1948. It may well be, as the appellants contend, that the February negotiations between the parties did not constitute a dispute within the purport of the statute. Cf. Fierst and Spector, supra, at p. 470. The evidence established, however, that by March there was a full scale controversy which indicated that the parties, notwithstanding their extended negotiations in good faith, were unable to reach agreement. This controversy between the employer and the representatives of the employees, concerned the terms and conditions of employment and was a labor dispute under the statute. Cf. Unemployment Compensation Commission of the Territory of Alaska v. Aragon, 329 U.S. 143, 151, 91 L.Ed. 136, 143 (1946), where Chief Justice Vinson said pertinently: "Dispute there certainly was; and the subject of that dispute consisted of matters usually contested in labor disputes as that term is normally understood."
As a result of the labor dispute there was a substantial curtailment in production at the employer's plant even prior to any of the lay offs. By the close of March only 10% of the normal amount of furs was in process; the authorities cited have recognized much lesser curtailment as sufficient to constitute stoppage within the statute. And although the labor dispute ended on June 15, 1948, this stoppage continued until June 30, 1948, when, under the finding of the Board, substantial production was first resumed. This delay occurred despite the diligent efforts of the employer to resume full production and may properly be said to have resulted directly from the labor dispute.
*79 Relying upon the fact that the labor contract negotiations were conducted mostly in New York City, the appellants advance the contention that the labor dispute did not exist "at the factory, establishment or other premises" at which they were employed. We consider this contention to be entirely without merit. Viewed realistically, the labor dispute was at the North Bergen plant; the fact that the representatives of the employer and the unions met at hotel rooms in New York City or elsewhere would not appear to have significance. See Unemployment Compensation Commission of the Territory of Alaska v. Aragon, supra.
The appellants have urged that their original layoffs were due to the lack of work rather than the labor dispute and terminated the employer-employee relationship and, as a result, the statutory disqualification was inapplicable. Under the Board's findings, in which we concur, the lack of work was directly attributable to the labor dispute and the temporary layoffs did not, for purposes of the labor dispute disqualification clause, sever the employer-employee relationship. See Miners in General Group v. Hicks, supra; Sandoval v. Industrial Commission, 110 Colo. 108, 130 P.2d 930 (Sup. Ct. 1942). Notwithstanding the layoffs the parties expected that when the labor dispute was terminated the employees would return to work at the employer's plant and, in fact, they did so. Cf. Bergen Point Iron Works v. Board of Review, 137 N.J.L. 685 (E. & A. 1948). Indeed, it has been held that where employees are laid off for reasons wholly unrelated to any controversy and a later labor dispute prevents their scheduled resumption of work, the statutory disqualification applies fully during the subsequent period of work stoppage resulting from the labor dispute. Abbott v. Appeals Board of Michigan Unemployment Compensation Commission, 323 Mich. 32, 34 N.W.2d 542 (Sup. Ct. 1948).
The determination of the Board of Review is affirmed.