36 N.J. Super. 322 (1955)
115 A.2d 575
MORRIS GERBER, PAUL HOFFMAN, JOHN MADDEN, JOHN MALINCHAK, JOHN O'NEILL AND H. HOWARD SCHUCHMAN, APPELLANTS,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY, THE FEDERATED METALS DIVISION OF AMERICAN SMELTING AND REFINING COMPANY AND THE ATTORNEY GENERAL OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 20, 1955.
Decided July 6, 1955.
*324 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Abraham L. Friedman argued the cause for appellants (Messrs. Rothbard, Harris & Oxfeld, attorneys).
*325 Mr. Clarence F. McGovern argued the cause for respondent Board of Review, Division of Employment Security, New Jersey Department of Labor and Industry.
Mr. Maurice Schapira argued the cause for respondent Federated Metals Division of American Smelting and Refining Company.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is an appeal by six claimants to review the decision of the respondent Board of Review of the Division of Employment Security, denying them unemployment compensation benefits. Claimant Hoffman also appeals the denial of his claim for temporary disability benefits. The claims were heard jointly and decided jointly.
Claimants were all employed as watchmen at the plant of respondent Federated Metals Division of the American Smelting and Refining Company in Newark. The employer had a collective bargaining contract with Local No. 143, International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW-CIO), covering the terms and conditions of employment for all production and maintenance employees and watchmen at the plant. Claimants were members of the local union and therefore covered by the contract. The contract ran from July 1, 1952 to June 30, 1953. It specially provided that watchmen should at no time engage in any strike, work stoppage, picketing, or any other conduct which might in any way interrupt or interfere with plant production, and that they would at all times fulfill and discharge their duties without regard to any strike or other interruption of or interference with plant production.
In view of the June 30, 1953 expiration date of the existing contract, the union and the employer entered into negotiations for a new contract. It is undisputed that the terms and conditions of employment of the watchmen were involved in these negotiations. The parties were unable to come to an agreement, with the result that on July 29, 1953 the *326 union called a strike which brought about a complete stoppage of production. All union members walked out, but the claimant watchmen continued their work pursuant to the mentioned provision of the expired contract.
Claimants continued to perform their duties until December 2, 1953 when each of them received a telegram from the company stating: "Shutting down plant completely due to strike and have no further need of your services." They also received a regular notice of discharge, the reason assigned for the action being in the same language as the telegram. Thereafter the employer assigned foremen, who were part of the supervisory personnel and therefore not within the union contract, to perform the watchmen's duties.
After their discharge, claimants made varying efforts to find other employment. Claimant Gerber was successful in getting a job on January 7, but quit after two weeks because he considered the work too hard for a man of his age. Claimant Hoffman became ill on January 2, 1954 and was hospitalized until February 4, 1954. Meantime, negotiations between the union and the company had resumed, a new contract had been effected and the plant reopened on February 1, 1954. All employees, including claimants, returned to work on that date, except for Hoffman who returned on February 8, 1954.
All six watchmen filed their claims for unemployment compensation benefits on December 4, 1953, immediately after they had been let out of work. Hoffman filed his claim for disability benefits on January 21, 1954. The claims were rejected by the Division of Employment Security and, after hearing on appeal, by the Appeal Tribunal of the Division. There was a further appeal to the Board of Review which held, after hearing, that claimants were disqualified for unemployment compensation benefits from December 2, 1953 to February 1, 1954, under N.J.S.A. 43:21-5(d) (unemployment due to stoppage of work resulting from a labor dispute), and, in the case of Schuchman and O'Neill, for the additional reason that they had not been available for work under N.J.S.A. 43:21-4(c). Claimants *327 then obtained an order to show cause why this omnibus decision, entered June 25, 1954, should not be set aside and a new decision made. There was a further hearing and on November 16, 1954 the Board of Review issued six separate orders, one for each of the claimants, holding they were all disqualified for benefits during the stated period because of a labor dispute at the establishment where they were last employed, under N.J.S.A. 43:21-5(d). In the case of Hoffman the board held he was disqualified for disability benefits from January 2 to February 8, 1954 under N.J.S.A. 43:21-4(f), because though unable to work due to illness, he was not eligible to receive unemployment compensation benefits under the act and hence not entitled to disability benefits. The board stated there was no evidence as to his eligibility for 4(f) benefits from the time the plant opened (February 1) until he returned to work on February 8.
N.J.S.A. 43:21-5(d), as in the case of similar legislation in more than 40 of the states, was taken from the labor dispute disqualification clause of the Social Security Board Draft Bill (section 5). First and Spector, Unemployment Compensation in Labor Disputes, 49 Yale L.J. 461 (1940). It provides that an individual shall be disqualified for benefits:
"(d) For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; provided, that this subsection shall not apply if it is shown that:
(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case in which (1) or (2) above applies separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises."
*328 It is uncontroverted that there was a "labor dispute" at the company plant. That term is not defined in the Unemployment Compensation Act (N.J.S.A. 43:21-1 et seq.), as it is in other labor enactments. The term broadly includes any controversy concerning terms or conditions of employment or arising out of the respective interests of employer and employee. Great A. & P. Tea Co. v. New Jersey Department of Labor & Industry, Division of Unemployment Compensation, 29 N.J. Super. 26, 30 (App. Div. 1953); Ablondi v. Board of Review, etc., 8 N.J. Super. 71, 76 (App. Div. 1950).
Nor is there any question that the labor dispute resulted in a "stoppage of work." This term generally refers to the cessation of plant operations. Ablondi v. Board of Review, above; Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, 308 Mich. 198, 13 N.W.2d 260, 154 A.L.R. 660 (Sup. Ct. 1944); certiorari denied 323 U.S. 738, 65 S.Ct. 43, 89 L.Ed. 591 (1944); Magner v. Kinney, 141 Neb. 122, 2 N.W.2d 689 (Sup. Ct. 1942). Stoppage need not be complete; it suffices if there is a substantial curtailment of operations. Magner v. Kinney, above; Fash v. Gordon, 398 Ill. 210, 75 N.E.2d 294 (Sup. Ct. 1947); Midvale Co. v. Unemployment Compensation Board of Review, 165 Pa. Super. 359, 67 A.2d 380 (Super. Ct. 1949). The term "stoppage of work" refers to the cessation or substantial curtailment of work in the factory, establishment or place of employment, and not to the cessation of work by the claimant or claimants. Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, above. See Fierst and Spector, above, at pages 483-4, generally.
Not only did the labor dispute result in a stoppage of work, but the stoppage in turn inevitably resulted in the unemployment of all production workers and, eventually, the watchmen. It is understandable that the employer company retained the watchmen as long as there was hope that the negotiations might result in a new contract and a resumption of work. But when negotiations broke down and production did not resume, the watchmen were let go. The testimony *329 for the employer was that the company could not afford to keep the men on the payroll because of the prolonged strike. Their unemployment was therefore, in the words of the statute "due to a stoppage of work" stemming from a labor dispute. The watchmen thereby became disqualified under the statute for benefits during the period of unemployment, from December 2, 1953 to February 1, 1954.
The fact that the company had its foremen take over the watchmen's duties does not change the result. As supervisory personnel the foremen were not involved in the union demands or the strike. They became idle when production stopped, and it was natural and economically practical that the company have them substituted for the watchmen after December 2.
We consider the reasoning of this court, speaking through then Judge Jacobs, in Ablondi v. Board of Review, 8 N.J. Super. 71 (1950), controlling. In that case the contracts between the respondent fur processing company and the fur workers' unions were to expire on April 30, 1948. The parties began negotiations early in February 1948 looking toward a new contract for the period beginning May 1, 1948. By mid-March it had become apparent to the company that it would be difficult to reach an agreement with the unions. The company thereupon began curtailing production; as the volume of processed skins declined it laid off more and more employees, with the result that not many remained at work when the contracts expired on April 30. There were no further negotiations until May 10; an agreement was eventually reached on June 15, and the employees went back to work between that date and June 30. The Board of Review held that the unemployment compensation benefit claimants were disqualified under N.J.S.A. 43:21-5(d). The Appellate Division affirmed, holding that the disqualification went to the entire period preceding June 30, 1948. After reviewing the history and meaning of the statute, it found that a full-scale controversy had developed between the parties by March, despite their extended negotiations; that there had been a substantial curtailment in production even prior to *330 any layoff; and that contrary to the workers' contention that the layoffs were due to lack of work rather than the labor dispute (the statutory disqualification therefore being inapplicable), the lack of work was directly attributable to the dispute and the temporary layoffs did not, for the purposes of the labor dispute disqualification clause, sever the employer-employee relationship.
So here. The layoff of the watchmen was directly attributable to the labor dispute. The layoffs were temporary, they did not sever the employer-employee relationship, and when the labor dispute ended the men promptly returned to work  and this had been their intention during the entire layoff period, according to their own testimony.
Claimants urge that it "seems reasonable to believe that the Legislature intended something of the nature of `direct and proximate cause,' as that concept has been applied in other fields of law," in adopting the language of N.J.S.A. 43:21-5(d). They frankly confess their lack of success in finding any court decision in point, either in our State or in any state having a statutory provision similar to ours. We are not here concerned with the tort theory of causal relationship. Cf. Fierst and Spector, above, at page 484, and Eligibility for Unemployment Benefits of Persons Involuntarily Unemployed Because of Labor Disputes, 49 Columbia L. Rev. 550, 554-5 (1949). We may not indulge in the suggested interpretation of the statute until it has been modified by special legislative amendment, as in Alabama where the statute disqualifies a claimant only if his unemployment is "directly due" to a labor dispute. Title 26 Ala. Code Ann., sec. 214, subd. A; Badgett v. Department of Industrial Relations, 243 Ala. 538, 10 So.2d 880 (Sup. Ct. 1942), reversing 30 Ala. App. 457, 10 So.2d 872 (Ct. App. 1942). The language of our act is that the unemployment be "due" to a stoppage of work which exists because of a labor dispute, not "directly due." But for the strike of the production workers, there never would have been a work stoppage and the watchmen would not have been laid off when they were.
*331 It is to be observed that N.J.S.A. 43:21-5(d) has remained unchanged since the Unemployment Compensation Law was first passed in 1936 (L. 1936, c. 270, sec. 5(d)), and this despite the Ablondi decision and others dealing with the particular section. The Ablondi case (8 N.J. Super., at page 77) refers to several attempts during the 1950 session of the New Jersey Legislature to amend the section, all of them unsuccessful. There have been a number of similar attempts at amendment since that time: S. 17, S. 280, A. 166, A. 287, A. 422, A. 607 of the 1951 session; S. 35, S. 200, A. 201 of the 1952 session; S. 269, A. 533 of the 1953 session; S. 156 of the 1954 session, and S. 85 of the 1955 session. None of these became law. As was said in Ablondi:
"We are not concerned with the wisdom or unwisdom of the labor dispute disqualification clause of our Unemployment Compensation Law; the important policy determination rests entirely with the Legislature. Our judicial function is confined to the interpretation and application of the comprehensive legislative phraseology in the light of its history, purpose and context." (8 N.J. Super., at page 75)
Claimants do not come within the escape clauses of N.J.S.A. 43:21-5(d). True, none of them was "participating in or financing" the labor dispute which caused the stoppage of work, but they were "interested in" that dispute. They were members of the union which had called the strike, and the terms and conditions of their employment as watchmen were part of the contract negotiations going on between the union and the employer company. Claimants were entirely willing to permit the union to act as their bargaining agent and to reap the benefits, if any, from its success. Accordingly, as members of the union, they were directly interested and directly involved in the labor dispute. Wasyluk v. Mack Mfg. Corp., 4 N.J. Super. 559, 562 (App. Div. 1949). They do not, therefore, come within the terms of the first of the escape clauses. The six claimants comprise the single class of watchmen at the company's plant; they were all *332 directly interested in the labor dispute and so may not have the benefit of the second of the escape clauses.
The two Kieckhefer Container Co. v. Unemployment Compensation Commission cases, 125 N.J.L. 52 and 55 (Sup. Ct. 1944), are clearly distinguishable on the facts. Neither of the two claimants there involved was a member of a labor union and each comprised a class by himself, one being a utility man and the other an odd jobs man. The former Supreme Court found that neither participated in or contributed to the union, or was directly interested in the dispute which caused the stoppage of work.
The labor dispute which led to the work stoppage in this case took place in the "factory, establishment, or other premises" where claimants were working. This distinguishes and makes inapplicable Ford Motor Co. v. New Jersey Dept. of Labor and Industry, 5 N.J. 494 (1950), on which claimants rely.
They also argue that the company's telegram and notice of discharge terminated the employment relationship, and hence there was no disqualification under N.J.S.A. 43:21-5(d), citing Great A. & P. Tea Co. v. New Jersey Dept. of Labor and Industry, 29 N.J. Super. 26 (App. Div. 1953). In that case there was a work stoppage on March 4, 1953 when the employees, in protest against the employer's plan to have them work a Saturday schedule, refused to return to their egg-candling jobs. They joined the union and picketed the plant. Two days later management notified them that it was discontinuing its operation and requested them to pick up their final wage checks. The court held there was a disqualifying work stoppage, but that it was brought to an end by the employer's decision to abandon its local operation, so that the employees were entitled to unemployment compensation benefits after March 7. The situation here is entirely different. The company did not, as did the A. & P. Tea Co., permanently close down its plant and discontinue operations. Claimants were temporarily laid off; as soon as the company again had need of their services  and this happened February 1, 1954 when negotiations for *333 a new contract were successfully concluded  it called all its men back. There was never a termination of the employer-employee relationship, as in the A. & P. Tea Co. case.
In view of our holding that claimants were disqualified for benefits from December 2, 1953 to February 1, 1954 under N.J.S.A. 43:21-5(d), we need not consider the other ground for disqualification considered by the Board of Review, namely, non-availability for work under N.J.S.A. 43:21-4(c). It also makes academic any discussion of the effect of the modification order issued by the Director of the Division of Employment Security on December 15, 1953, modifying the "actively seeking work" requirement of that section "for all claimants for whom available suitable work does not exist in perceivable quantity."
One matter remains  the determination of the Board of Review that claimant Hoffman was disqualified for disability benefits for the entire period of his illness, ending with his return to work on February 8, 1954. It so concluded despite the statement made by its chairman in the course of the hearing that "the labor dispute and stoppage ended February 1 so that there seems to be no dispute as to his (Hoffman's) right to collect disability benefits from the first to the eighth. * * * After that (February 1) he was unable to work because he was sick; there is no question he was entitled to disability at that time." And the Board in its order made a specific finding of fact that Hoffman "became ill on January 2 and was disabled until February 8, 1954." This being so, he was entitled to benefits under N.J.S.A. 43:21-4(f), for the period from February 1 to 7, 1954, inclusive.
The determinations of the Board of Review are affirmed as to all the claimants except Hoffman. The determination in his case will be modified to award disability benefits from February 1 to 7, 1954, inclusive, and as modified is affirmed.