927 A.2d 164

LOURDES MEDICAL CENTER OF BURLINGTON COUNTY, APPELLANT, v. BOARD OF REVIEW, RESPONDENT, AND DIANE PRESTWOOD, SANDRA C. VODA, JEANNE RICHARDSON, BETH A. BENN, LIESA P. MILLINGTON, BARBARA J. MARTIN, PATRICIA A. SOZIO, EDNA E. MORRISSEY, BERNICE AMARH, DEBORAH L. SORRENTINO, KARON R. BRANCH, NANCY ZIRPOLI, CYNTHIA L. BORGSTROM, QUETTELY G. DANASTOR, DONNA TAYLOR RIVERA, VIRGINIA L. BROWN, ANNETTE M. RIDGE, JUANITA BUSSIE, CANDACE L. WEBB, JUANITA PAYNE, CHRISTINE M. GALLAGHER, JANE E. MAHER, MARIA MIRAGLIA, PAULA M. CLARK, PEGGY A. GLASPEY, DOROTHEA D. CURTIS THOMAS, KATHLEEN C. NASTO, REGINA M. JONES, THOMAS W. BRAY, KITTY L. STOUT, DZIGBORDI A. AHIEKPOR, LINDA L. PINE, FLORENCIA A. BAKER, ROVENUS D. LITTLE, MARCI J. LYONS, PATRICIA L. BOZZI, MARYANN K. LAVERTY, NANCY KELLY, PHYLLIS M. SNOW, KATHLEEN M. MORAN, ROBERT A. WALSH, BRENDA MORRISON, MARY MAIETTA, PATRICIA A. RALPH, JOSEPHINE M. FOLZ, JOSEPH R. PARKER, KIMBERLIN J. SANSONI, PATRICIA A. MARTINO, ANNA CLARK, CAROLYN D. STEVENSON, DORIS E. ROBERTS, ANNA V. SIA, AYISHA BRYANT, MARY E. MURRAY, ROSA E. JONES, LOIS J. PRICE, CHRISTINE M. MUELLER, DEBBIE A. STEWART, MARY A. BEAUDET, SHARON M. SHEDAKER, BETH A. SLIMM, SHIRLEY J. MEGARGEE, ELEANOR A. NEUENFELDT, MILDRED E. PERRY, TERESA E. LAVERTY, CAROLYN M. RICHMAN, CAROL A. ANDERSON, SUSAN L.

GARBE, SHIRLEY D. RICHARDSON, PURIFICACION C. ST. GEORGE, YSABEL L. GALICK, ANNETTE L. ZELAUSKAS, RUTH BEST, THERESA A. SCHIERS, MARY F. HANSEN, CAROL A. KINKADE, NEDINA C. JORDEN, ELIZABETH HALL, VALARIE L. STANLEY, SANDRA L. IWANICKI, MARGARET J. CLIVER, STEPHANIE J. SAMAR, STEPHANIE L. SMITH, JACQUELINE R. KIRBY, NORA DUNN, BARBARA V. JONES, REGINA HASS, MARIANNE NEWMAN, LINDA L. MAKRIS, PATRICIA A. MELCHIORRE, JOAN R. MCDOWELL, PATRICIA L. MCQUARRIE, LISA A. HALL, SUSAN STARK, SANDRALEE HEINZE, DEBORAH L. GOSS, AND KATHLEEN DENTON, CLAIMANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted February 5, 2007—Decided July 12, 2007.

450

Before Judges LINTNER, SELTZER and C.L. MINIMAN.

*Morgan, Lewis & Bockius,* attorneys for appellant (*Lawrence B. Fine,* of counsel; *Thomas A. Linthorst* and *Eric S. Lasky,* on the brief).

*Stuart Rabner,* Attorney General, attorney for respondent Board of Review (*Michael J. Haas,* Assistant Attorney General, of counsel; *Jennifer B. Pitre,* Deputy Attorney General, on the brief).

*Kroll Heineman & Giblin,* attorneys for claimants-respondents (*Raymond G. Heineman,* on the brief).

*Jackson Lewis,* attorneys for *amicus curiae* New Jersey Hospital Association (*Richard W. Schey* and *David G. Islinger,* of counsel; *Robert M. Pettigrew,* on the brief).

*Brennan & Bernardin,* attorneys for *amicus curiae* Chamber of Commerce of Southern New Jersey, Burlington County Chamber of Commerce, and Cherry Hill Regional Chamber of Commerce (*Michael G. Brennan* and *Daniel A. Bernardin,* on the brief).

The opinion of the court was delivered by

MINIMAN, J.A.D.

After between 240 and 280 nurses employed by appellant Lourdes Medical Center of Burlington County (Lourdes) walked off the job on April 19, 2004, ninety-seven of the nurses filed for unemployment benefits on June 6, 2004. Unemployment benefits are designed to "ameliorate the impact of involuntary unemployment." *Sweeney v. Bd. of Review,* 43 *N.J.* 535, 539, 206 *A.2d* 345 (1965). Generally, employees who are unemployed as a result of a stoppage of work relating to a labor dispute are disqualified from receiving unemployment benefits. *N.J.S.A.* 43:21–5(d); *N.J.A.C.* 12:17–12.2(a)(1). That regulation provides that the stoppage of work must so curtail production that the employer cannot produce "more than 80 percent of [its] normal ... goods or services." *N.J.A.C.* 12:17–12.2(a)(2). The Deputy Director, Division of Unemployment Insurance, ruled on June 15, 2004, that the nurses were entitled to benefits and that the labor dispute disqualification of *N.J.S.A.* 43:21–5(d) did not apply by virtue of *N.J.A.C.* 12:17–12.2(a)(2).

Lourdes timely appealed and the Appeal Tribunal conducted a hearing on September 22, 2004. At that time the strike was in its fifth month. In one consolidated, written opinion on November 5, 2004, the Tribunal affirmed the Deputy Director's decision. On further appeal to the Department of Labor ("DOL"), Board of Review ("the Board"), the decision of the Appeal Tribunal was affirmed on March 11, 2005, in ninety-seven separate, identical opinions. We granted leave to file one appeal from all ninety-

seven decisions. We now reverse and remand these matters to the Board for further proceedings consistent with this opinion.

## I.

The evidence offered at the September 22, 2004, hearing established that Lourdes is a nonprofit hospital located in Willingboro, New Jersey. "Its mission is to serve as a comprehensive community hospital and meet the needs of the community, regardless of ability to pay." It was licensed as a 259–bed hospital prior to the April 19, 2004, strike and employed approximately 2000 people. Lourdes' goals prior to the strike were to grow, add more services, and bring in more physicians.

The nurses, members of JNESO Local District Council 1 Labor Union ("JNESO"), had been working without a contract since the end of February 2004. When the strike commenced, JNESO set up picket lines at each of Lourdes' five entrances and maintained them through the date of the hearing before the Appeal Tribunal. Members of the public had to cross the picket lines to use the main entrance to Lourdes and some vendors refused to cross the lines.

John Nespoli, the Chief Administrative Officer of Lourdes, stated that the most significant impact of the strike was the fear it created in the community that Lourdes was going to close its doors. The relationship with the community became quite difficult. Many damaging rumors circulated for months. As a consequence, Lourdes' public relations personnel were required to focus their efforts ten to twelve hours per day on strike-related activities, rather than their usual activities. The cost of management time increased because management had to "hold[ ] the community together" and assure it that Lourdes would not close its doors. Additionally, the strike had a destabilizing effect on the non-nursing staff of the hospital, which represented about seventy percent of all employees. The relationship with these employees was extremely difficult. This required management to become involved in communications efforts with the remaining staff to try

to offset the effect of the strike. Normal management priorities were set aside.

Lourdes believed that it would have experienced substantial growth in the absence of the strike. However, the strike caused Lourdes to lose opportunities to improve new positions and start new programs. For example, new medical groups that Lourdes had been recruiting to come on staff delayed forming a relationship with it. Lourdes lost revenue in the form of a $750,000 grant from the State for obstetric funding, which was temporarily denied, allegedly at the behest of JNESO, specifically because of the strike. The loss of this grant added to the deficit. In spite of the absence of this funding, Lourdes continued to operate an obstetrics clinic. Also, the opening of a one-million-dollar laboratory system was briefly delayed.

Notably, the strike caused a significant increase in labor costs. Initially, Lourdes hired temporary nurses to replace the striking nurses at a daily cost of $56,000, compared to an average of $100,000 per month it spent on agency nurses before the strike. When it appeared that the parties had reached an impasse, Lourdes began searching for permanent replacements. By the time of the hearing, almost 200 temporary nurses had worked at Lourdes. After the strike, approximately two-thirds of Lourdes' nurses were temporary. Lourdes offered work to the striking nurses, and about eighty crossed the picket line and returned to work. Lourdes also hired forty new nurses and was required to hire additional security guards because of the strike. Over time, the cost of temporary agency nurses remained substantial, in the neighborhood of $1 million per month. Pre-strike, the monthly cost of the nursing staff was $1.3 to $1.5 million; after the strike, that figure rose to $2.15 million plus an additional $100,000 per month for housing and travel expenses for the agency nurses.

Lourdes' revenues remained relatively stable during the strike. However, due to the increased labor costs, operational losses increased. In 2003, the year before the strike, losses for hospital operations were $10.5 million, and in the first quarter of 2004,

losses were $600,000 per month. Thereafter, monthly losses jumped to between $1.4 and $1.75 million for each month between April and July 2004. Losses for 2004 were projected to grow by $8,000,000 above 2003 losses. According to Lourdes' finance director, the increase in losses was related to the strike. Nespoli observed that if the losses were to continue, Lourdes could not stay open forever.

Technically, Lourdes could have shut down, although it did not wish to do so.[1] Nespoli testified that closing Lourdes would be "a complex, lengthy, regulatory, legal process." A certificate of need would be required to close Lourdes and then Lourdes could shut down only if the Department of Health and Senior Services ("DHSS") approved the shut down. Nespoli estimated that the process of closing would take one year to complete. When the strike began, Nespoli was required to appear before the DHSS to present Lourdes' strike plan, including data on how Lourdes was going to be staffed during the strike. That plan was reviewed and approved by the DHSS.

It was undisputed that nonunion personnel or managers never performed the duties of the striking nurses. Lourdes' hours of operation remained the same; no procedures were curtailed in any of Lourdes' departments (some departments even experienced increases in patient levels); and, finally, no one was laid off or discharged because of the strike. Indeed, Lourdes publicly declared that its operations were running smoothly notwithstanding the strike. Additionally, several physicians at Lourdes signed an open letter to the community stating that the level of nursing care at Lourdes was excellent, and that Lourdes was operating at pre-strike levels.

## II.

The Appeals Examiner made the following findings of fact on November 5, 2004:

---

[1] Among other reasons, Lourdes was obligated to remain open in order to continue to receive Medicare and Medicaid funds.

> The claimants were all registered nurses and members of the JNESO District Council 1 labor union. They were employed by [Lourdes] at the Willingboro, NJ location through 04/19/2004 when they went on strike at 7 am. The striking 240 union members manned picket lines twenty-four hours per day, seven days per week for the duration of the strike. There was a dispute over the contract that had expired at the end of February, 2004. No new contract has been ratified. [Lourdes] is a 259–bed hospital that contains an emergency room and provides a large variety of medical services to the public. They employ approximately 2000 employees in a variety of health-related occupations. To remain open during the strike, the employer hired additional agency nurses to replace the striking registered nurses at a cost of $1,000,000 per month. During the strike, they hired approximately 40 new nurses, and more than 80 striking union nurses have returned to work.
>
> During the strike, the hospital was able to operate at normal occupancy levels and the census of patients did not decrease because of the strike. The hospital did not reduce the medical procedures or services provided to the public during the strike. They continued to release information to the public indicating that they were providing all of the same quality services that they had provided prior to the strike.

The Appeals Examiner concluded that the nurses were not disqualified for benefits under *N.J.S.A.* 43:21–5(d) because there was no "stoppage of work" as that term has been defined in *N.J.A.C.* 12:17–12.2(a)(2).

In affirming the Appeals Tribunal, the Board adopted the findings and conclusions of the Appeals Examiner. The Board also distinguished its earlier decision, in which it construed *N.J.S.A.* 43:21–5(d) and *N.J.A.C.* 12:17–12.2(a)(2) as permitting a finding of a work stoppage under the eighty-percent rule where output could not be curtailed as a result of regulatory requirements, but where "routine work processes were reduced, postponed or left undone." *In re D.M. (Amergen Energy Co., LLC)*, No. 04–B–00775–000–XO, final decision (Dep't of Labor, Bd. of Review Feb. 4, 2005) ("*Amergen*"), *aff'd sub nom., Dominicus v. Bd. of Review, Dep't of Labor,* No. A–3352–04, 2007 *WL* 92415 (N.J.Super.App.Div. Jan. 2, 2007). The Board reasoned here that Lourdes hired replacement workers and, thus, there was no curtailment of routine work processes.

### III.

Lourdes contends on appeal that we should invalidate *N.J.A.C.* 12:17–12.2(a)(2) because (1) the DOL failed to provide any expla-

nation for the eighty-percent standard; (2) measuring a stoppage of work by reference to the employer is at odds with the language of *N.J.S.A.* 43:21–5(d); (3) the application of the regulation to hospitals is inconsistent with New Jersey's policy favoring uninterrupted, affordable healthcare and contravenes New Jersey's policy of neutrality in labor disputes; and (4) the regulation as applied is arbitrary and should be declared invalid.

Lourdes also argues that the Board erred by relying solely on the eighty-percent rule and refusing to consider the full effect of the JNESO strike on the hospital because (1) the statute and regulation required the Board to consider a variety of factors in determining whether there is a stoppage of work; (2) the regulation's reference to "normal production" requires the Board to consider the abnormality of post-strike operations; and (3) the Board's decision contravenes New Jersey's policy regarding the provision of quality healthcare services to the public and is inconsistent with neutrality in labor disputes.

### IV.

We are not persuaded that this regulation should be declared invalid. We begin our consideration of Lourdes' arguments respecting the validity of the regulation by restating applicable legal principles. Appellate review of challenges to the rulemaking function of administrative agencies is limited. "Administrative regulations are accorded a presumption of validity." *N.J. State League of Municipalities v. Dep't of Cmty. Affairs*, 158 *N.J.* 211, 222, 729 *A.*2d 21 (1999); *see also In re Petition of N.J. Am. Water Co.*, 169 *N.J.* 181, 188, 777 *A.*2d 46 (2001); *GE Solid State, Inc. v. Dir., Div. of Taxation*, 132 *N.J.* 298, 306, 625 *A.*2d 468 (1993); *Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot.*, 101 *N.J.* 95, 104, 501 *A.*2d 125 (1985); *N.J. Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978); *In re Readoption with Amendments of Death Penalty Regulations N.J.A.C. 10A:23*, 367 *N.J.Super.* 61, 66, 842 *A.*2d 207 (App.Div.), *certif. denied*, 182 *N.J.* 149, 862 *A.*2d 57 (2004).

Reviewing courts accord substantial deference to an agency's interpretation of a statute that it is charged with enforcing. *GE Solid State, supra,* 132 *N.J.* at 306, 625 *A.2d* 468. That deference stems from the recognition that agencies have specialized expertise and superior knowledge in the areas of law delegated by the Legislature. *Brady v. Bd. of Review,* 152 *N.J.* 197, 210, 704 *A.2d* 547 (1997); *Hutchens v. Bd. of Review,* 368 *N.J.Super.* 9, 13, 845 *A.2d* 164 (App.Div.2004). Administrative agencies "are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that … rulemaking would invite.'" *League of Municipalities, supra,* 158 *N.J.* at 222, 729 *A.2d* 21 (quoting *Bergen Pines County Hosp. v. N.J. Dep't of Human Servs.,* 96 *N.J.* 456, 474, 476 *A.2d* 784 (1984)). The same level of deference applies to an agency's interpretation of its own regulations, which should not be rejected unless that interpretation is inconsistent with the governing legislation. *DiMaria v. Bd. of Trustees of Pub. Employees' Ret. Sys.,* 225 *N.J.Super.* 341, 351, 542 *A.2d* 498 (App.Div.), *certif. denied,* 113 *N.J.* 638, 552 *A.2d* 164 (1988).

However, a regulation "'must be within the fair contemplation of the delegation of the enabling statute.'" *Hearing Aid Dispensers, supra,* 75 *N.J.* at 561–62, 384 *A.2d* 795 (quoting *S. Jersey Airways, Inc. v. Nat'l Bank of Secaucus,* 108 *N.J.Super.* 369, 383, 261 *A.2d* 399 (App.Div.1970)). Additionally, "the absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation." *A.A. Mastrangelo, Inc. v. Comm'r of Dep't of Envtl. Prot.,* 90 *N.J.* 666, 683–84, 449 *A.2d* 516 (1982). "[T]he reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." *Hearing Aid Dispensers, supra,* 75 *N.J.* at 562, 384 *A.2d* 795.

 Nonetheless, the well-established presumption of validity "cannot be employed as a means for validating an exercise of authority that has no provenance in the enabling legislation." *Knight v. Hoboken Rent Leveling & Stabilization Bd.*, 332 *N.J.Super.* 547, 552, 753 *A*.2d 1231 (App.Div.2000). *Accord T.H. v. Div. of Developmental Disabilities*, 189 *N.J.* 478, 490–91, 916 *A*.2d 1025 (2007). An administrative agency cannot give a statute greater effect than is permitted under the statutory language. *In re Adoption of N.J.A.C. 7:26B*, 128 *N.J.* 442, 450, 608 *A*.2d 288 (1992); *In re Adopted Amendments to N.J.A.C. 7:7A–2.4,* 365 *N.J.Super.* 255, 265, 839 *A*.2d 60 (App.Div.2003); *L. Feriozzi Concrete Co. v. Casino Reinvestment Dev. Auth.*, 342 *N.J.Super.* 237, 250, 776 *A*.2d 254 (App.Div.2001). Courts "will intercede if the agency's action exceeds the bounds of its discretion." *In re Distribution of Liquid Assets*, 168 *N.J.* 1, 11, 773 *A*.2d 6 (2001). At the same time, findings of ultra vires actions by agencies are disfavored. *Hearing Aid Dispensers, supra,* 75 *N.J.* at 561, 384 *A*.2d 795; *In re Adopted Amendments to N.J.A.C. 7:7A–2.4, supra,* 365 *N.J.Super.* at 264, 839 *A*.2d 60.

 In considering the regulatory issues raised by Lourdes, we note that "[t]he party challenging their validity bears the burden of proving that the regulations are arbitrary, capricious or unreasonable." *League of Municipalities, supra,* 158 *N.J.* at 222, 729 *A*.2d 21; *see also In re Amendment of N.J.A.C. 8:31B–3.31,* 119 *N.J.* 531, 543–44, 575 *A*.2d 481 (1990); *Hearing Aid Dispensers, supra,* 75 *N.J.* at 561, 384 *A*.2d 795.

The Hospital argues that *N.J.A.C.* 12:17–12.2(a)(2) is ultra vires because it contradicts the text and intent of the New Jersey Unemployment Compensation Law, *N.J.S.A.* 43:21–1 to –24.30 ("the Law"), by defining "stoppage of work" with reference to the *employer's* operations rather than the *employee's* actions. The Law is focused on lightening the burden of involuntary unemployment. The public policy behind the Law is set forth in *N.J.S.A.* 43:21–2:

> [E]conomic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family.

"Through this declaration of public policy, the Legislature indicated that the underlying mission of the [Law] is 'to afford protection against the hazards of economic insecurity due to *involuntary* unemployment.'" *Brady, supra,* 152 *N.J.* at 211, 704 *A.*2d 547 (quoting *Yardville Supply Co. v. Bd. of Review,* 114 *N.J.* 371, 374, 554 *A.*2d 1337 (1989)). Thus, the purpose of the Law is to provide income to the worker who is out of work "'through no fault or act of his own.'" *Id.* at 212, 704 *A.*2d 547 (quoting *Yardville, supra,* 114 *N.J.* at 375, 554 *A.*2d 1337) (emphasis omitted).

The Act is to be liberally construed. *Ibid.* However, "'it is also important to preserve the [unemployment insurance trust] fund against claims by those not intended to share in its benefits. The basic policy of the law is advanced as well when benefits are denied in improper cases as when they are allowed in proper cases.'" *Ibid.* (quoting *Yardville, supra,* 114 *N.J.* at 374, 554 *A.*2d 1337) (alteration in original).

Striking workers are generally disqualified from the receipt of unemployment benefits "[i]f it is found that this unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which the individual is or was last employed." *N.J.S.A.* 43:21–5(d). However, the Act contains an exception:

> (1) No disqualification under this subsection (d) shall apply if it is shown that:
>
> (a) The individual is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
>
> (b) The individual does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute.
>
> [*N.J.S.A.* 43:21–5(d)(1).]

Thus, striking employees may draw upon the fund, provided the employer has not experienced a "stoppage of work." *Sweeney, supra*, 43 *N.J.* at 539, 206 *A.*2d 345.

The DOL has interpreted this statutory provision at *N.J.A.C.* 12:17–12.2. The rule was proposed on November 4, 1996, and became effective on June 1, 1998. 30 *N.J.R.* 2027(a) (June 1, 1998). It defined the phrase "stoppage of work" as a "substantial curtailment of work which is due to a labor dispute." *N.J.A.C.* 12:17–12.2(a)(2). "Substantial curtailment" was also defined: "An employer is considered to have a substantial curtailment of work if not more than 80 percent of the normal production of goods or services is met." *Ibid.*

▮▮▮ The regulation as promulgated was consistent with long-extant case law interpreting the governing statute, which held that "[t]he term 'stoppage of work' refers to the cessation or substantial curtailment of work in the factory, establishment or place of employment, and not to the cessation of work by the claimant or claimants." *Gerber v. Bd. of Review*, 36 *N.J.Super.* 322, 328, 115 *A.*2d 575 (App.Div.1955), *aff'd*, 20 *N.J.* 561, 120 *A.*2d 436 (1956); *see also Ablondi v. Bd. of Review*, 8 *N.J.Super.* 71, 76, 73 *A.*2d 262 (App.Div.1950). Sister states have also adopted this view. *Employment Sec. Admin. v. Browning–Ferris, Inc.*, 292 *Md.* 515, 438 *A.*2d 1356, 1361 (1982) (citing *Ablondi* and noting that twenty-two states, including New Jersey, have held that the phrase "stoppage of work" means a curtailment of the employer's operations and not the cessation of work by the employees). We are satisfied that *N.J.A.C.* 12:17–12.2(a)(2) is consistent with *N.J.S.A.* 43:21–5(d) and not ultra vires.

We are likewise not persuaded that the eighty-percent rule is arbitrary and capricious on its face. Indeed, at the time the regulation was promulgated we had found that a substantial curtailment occurred when the employer could only produce ten percent of normal production. *Ablondi, supra*, 8 *N.J.Super.* at 76–78, 73 *A.*2d 262. The eighty-percent rule is much more favorable to employers than the holding in *Ablondi*.

■ Finally, we do not find that the regulation violates New Jersey's public policy declaring "hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost [to be a] vital concern to the public health." *N.J.S.A.* 26:2H–1. That policy is protected by the requirement that hospitals must secure the permission of the State in order to close. *N.J.A.C.* 8:33–3.2(b). If the Legislature considered labor disputes violative of its public policy, it would have barred them. Applying the regulations respecting unemployment benefits to hospitals in the event of a work stoppage is less disruptive to hospital care services than the labor dispute itself.

■ Neither are we persuaded that the regulation contravenes New Jersey's public policy in favor of state neutrality in labor disputes as identified in *Ablondi, supra,* 8 *N.J.Super.* at 76, 73 *A.*2d 262. Although the purpose of the labor dispute disqualification provision is to prevent strikers from receiving financial assistance in their dispute with management, *Bogue Elec. Co. v. Bd. of Review,* 21 *N.J.* 431, 434–35, 122 *A.*2d 615 (1956), the Legislature did not create a per se disqualification, but rather one with certain exceptions carved out of the disqualification. *N.J.S.A.* 43:21–5(d). The regulation is consistent with that statutory scheme and the public policy supporting it.

## V.

Lourdes next contends that the Board erred by relying solely on the eighty-percent rule and refusing to consider the full effect of the JNESO strike on the hospital. Lourdes argues that (1) the statute and regulation required the Board to consider a variety of factors in determining whether there is a stoppage of work; (2) the regulation's reference to "normal production" requires the Board to consider the abnormality of post-strike operations; and (3) the Board's decision contravenes New Jersey's policy regarding the provision of quality healthcare services to the public and is inconsistent with neutrality in labor disputes.

█ The judicial role in reviewing decisions of administrative agencies is restricted to the following four inquires:

(1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*George Harms Constr. Co. v. N.J. Tpk. Auth.*, 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994).]

█ Accordingly, "[o]ur function is to determine whether the administrative action was arbitrary, capricious or unreasonable." *Burris v. Police Dep't, Twp. of W. Orange*, 338 *N.J.Super.* 493, 496, 769 *A.*2d 1112 (App.Div.2001) (citing to *Henry v. Rahway State Prison*, 81 *N.J.* 571, 580, 410 *A.*2d 686 (1980)). The precise issue is whether the findings of the agency could have been reached on the credible evidence in the record, considering the proofs as a whole. *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965).

█ The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the person challenging the administrative action. *McGowan v. N.J. State Parole Bd.*, 347 *N.J.Super.* 544, 563, 790 *A.*2d 974 (App.Div.2002); *Barone v. Dep't of Human Servs., Div. of Med. Assistance & Health Servs.*, 210 *N.J.Super.* 276, 285, 509 *A.*2d 786 (App.Div.1986), *aff'd*, 107 *N.J.* 355, 526 *A.*2d 1055 (1987).

█ Additionally, "[i]t is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" *Wnuck v. N.J. Div. of Motor Vehicles*, 337 *N.J.Super.* 52, 56, 766 *A.*2d 312 (App.Div.2001) (quoting *In re Appeal by Progressive Cas. Ins. Co.*, 307 *N.J.Super.* 93, 102, 704 *A.*2d 562 (App.Div.1997)) (alteration in original). "Absent arbitrary, unreasonable or capricious action, the agency's determination must be affirmed." *Wnuck, supra*, 337 *N.J.Super.* at 56, 766 *A.*2d 312 (citing *R & R Mktg., L.L.C. v. Brown–Forman Corp.*, 158 *N.J.* 170, 175, 729 *A.*2d 1 (1999)).

Although we must give deference to an administrative agency charged with interpretation of the law, we are not bound by the agency's legal opinions. *Levine v. State, Dep't of Transp.*, 338 *N.J.Super.* 28, 32, 768 *A.*2d 192 (App.Div.2001) (citing *G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs.*, 157 *N.J.* 161, 170, 723 *A.*2d 612 (1999); *see also Mayflower Sec. Co. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973)).

The Board has previously considered the application of *N.J.A.C.* 12:17–12.2(a)(2) to a regulated industry. *See Amergen, supra.* There, the employer operated a nuclear-powered electric-generating facility with 439 workers. Two days after a routine shut-down of the nuclear reactor for repairs, the union went on strike and 219 workers withheld their services. The employer brought in workers from other facilities to finish the repairs, and the plant was restarted six days after the strike began. The strike, however, continued for an additional ten weeks.

While the union workers were on strike, the plant generated electricity at full capacity. "The work that was normally done by the bargaining unit workers, who were clerks, reactor operators, mechanics, technicians, electricians, building maintenance workers, utility workers, warehouse workers and radiation protection workers, was done by management and technical personnel who worked overtime but whose own work was substantially curtailed." *Amergen, supra,* slip op. at 1–2. However, the workforce was only able to complete fifty to sixty percent of the work normally done.

Claims for unemployment compensation were made by the striking workers, and the Appeal Tribunal held that there was no disqualification. The Appeal Tribunal found that there had been no stoppage of work because the employer continued to produce electricity at full capacity and there had been no substantial curtailment of the normal production of goods and services.

The employer appealed to the Board, making three arguments. First, it argued that *N.J.A.C.* 12:17–12.2(a) is invalid. Second, it argued that the regulation, even if valid, did not apply to a public

utility. Third, it argued that, even assuming the regulation was valid and that it applied to utilities, a stoppage of work existed. The Board rejected the first two arguments. It held that the stoppage of work standard set forth in *N.J.A.C.* 12:17–12.2 was consistent with Board precedents, and it rejected the employer's request for an exemption for utilities from the eighty percent rule.

However, the Board was persuaded that the employer had experienced a "stoppage of work" because there had been a substantial curtailment of work. The Board found that the Appeal Tribunal's sole focus on the employer's output of electricity as a measure of "normal production of goods and services" was too narrow an interpretation of the regulation and was "at odds with the intent of the statute." *Amergen, supra,* slip op. at 3.

The Board's conclusion that a stoppage of work occurred was based on the following: First, half of the workforce withdrew their services during the strike; accordingly, the Board found that "it is difficult to believe that the employer's normal procedures would not have been substantially affected." *Ibid.* Second, the record reflected that routine work processes and projects were reduced, postponed or left undone during the strike. Finally, the plant manager testified that, during the strike, the overall work processes at the plant were only fifty to sixty percent of the usual work completed. Accordingly, the Board was convinced a work stoppage had occurred and therefore the claimants were disqualified from receiving benefits in accordance with *N.J.S.A.* 43:21–5(d).

The Board's conclusions were affirmed on appeal. *Dominicus, supra,* 2007 *WL* 92415 at *3. There,

> [W]e interpret[ed] this regulation as including, within "goods and services," not only the goods and services that the plant normally supplies to customers, but also the goods and services that are provided within the plant to facilitate production and planning for future activities. This interpretation includes, for example, managerial and business services, training activities, monitoring or assessment services, and similar functions that are normally performed by the plant for safe, efficient production, and future operations.
>
> [*Id.* at *2.]

The Board distinguished its decision in *Amergen* from the facts before it here on the ground that the hospital had hired replacement workers. This fact alone is not sufficient to exempt this case from the flexible approach to the determination of a stoppage of work in the context of a regulated industry that was adopted by the Board in *Amergen*. Mere consideration of the number of patients is patently inconsistent with the Board's determination in *Amergen* that output of electricity at prestrike levels was not the end of the inquiry in determining whether a stoppage of work had occurred.[2]

Here, similar to *Amergen*, the entire nursing workforce withdrew their services during the strike. Although the percentage of the workforce on strike was less than that of *Amergen*, a hospital cannot operate without registered and licensed nurses. Like *Amergen*, "it is difficult to believe that the employer's normal procedures would not have been substantially affected." *Id.* at 3. Here, the record reflects that routine work processes and projects were reduced, postponed or left undone during the strike. Thus, two of the Board's three *Amergen* findings exist here.

The third factor considered by the Board in *Amergen* was the reduction in the overall work processes at the plant, which were only fifty to sixty percent of the usual work completed even though energy production was maintained. Here, witnesses for Lourdes testified that routine work processes and projects were reduced, postponed or left undone during the strike. They also testified to significant financial deficits directly attributable to the cost of securing replacement nurses. However, there was no statistical analysis provided analyzing the effect of these reduc-

---

[2] We note that Lourdes contends that the "evidence establishes that the Hospital's average patient census in the first three full months following the strike did decline to 86 percent of the average monthly patient census for the previous 12 months, or 83 percent of the average monthly census for 2003," contrary to the Board's finding that "the census of patients did not decrease because of the strike." We need not discuss this issue in light of our remand on other grounds.

tions and establishing that the net revenue was reduced by twenty percent or more.

Lourdes, like Amergen Energy Company, had very little choice as a regulated entity when faced with a strike. Unlike Amergen Energy Company, Lourdes did not have other workers it could shift to perform nursing services because of the training and licensing requirements for registered and licensed practical nurses. It had to either shut down, a regulatory process that the record suggests would take up to a year, or hire replacement nurses at great additional expense. Therefore, the yardstick of overall work processes at the hospital is inapplicable. Other jurisdictions have recognized that revenue is an appropriate factor to consider in the context of a stoppage of work. *See Acheson v. Dep't of Employment Sec.,* 19 *Wash.App.* 915, 579 *P.*2d 953, 956 (1978); *Whitcomb v. Dep't of Employment & Training,* 147 *Vt.* 525, 520 *A.*2d 602, 604 (1986); *Browning–Ferris, Inc., supra,* 438 *A.*2d at 1364–65; *Hertz Corp. v. Acting Dir., Div. of Employment & Training,* 437 *Mass.* 295, 771 *N.E.*2d 153, 157–58 (2002). In a situation such as is presented here, we are persuaded that revenue is a factor that must be considered in determining whether there was a stoppage of work as a result of a labor dispute. Therefore, the Board must consider whether the financial expense to which the hospital was put to maintain normal levels of service to the community, including its net revenue, constitutes a stoppage of work within the meaning and intendment of the statute and regulation here at issue.

Reversed and remanded for further proceedings consistent with this opinion.