776 A.2d 254 (2001)
342 N.J. Super. 237
L. FERIOZZI CONCRETE COMPANY, INC., a New Jersey Corporation, and Concetta Feriozzi, Plaintiffs-Respondents,
v.
CASINO REINVESTMENT DEVELOPMENT AUTHORITY and James B. Kennedy, Executive Director of the Casino Reinvestment Development Authority, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 2001.
Decided July 12, 2001.
*256 Patrick J. McAuley, Roseland, argued the cause for appellants (Connell Foley, attorneys; Mr. McAuley, of counsel; Mr. McAuley, Thomas A. Sparno and Walter R. Krzastek, on the brief).
Salvatore Perillo, Atlantic City, argued the cause for respondents (Perskie, Nehmad & Perillo, attorneys; Mr. Perillo and Steven J. Brog, on the brief).
Jessica A. Roth, Newark, argued the cause for amicus curiae NAACP Legal Defense & Educational Fund, Inc., (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; John J. Gibbons, Lawrence S. Lustberg and Jessica A. Roth, on the brief).
Lowenstein Sandler, attorneys for amicus curiae Utility and Transportation Contractors Association of New Jersey, Inc. (Steven E. Brawer, Roseland, of counsel; Cecelia E. Haney, Trenton, and Adrienne L. Isacoff, on the brief).
Before Judges WALLACE, JR., CARCHMAN and LINTNER.
*255 The opinion of the court was delivered by CARCHMAN, J.A.D.
The Casino Reinvestment Development Authority (CRDA or Authority) and its executive director, James B. Kennedy (collectively, defendants), appeal from a Law Division judgment sustaining plaintiffs' L. Feriozzi Concrete Company's and Concetta Feriozzi's (plaintiffs) equal protection challenge to a minority business enterprise (MBE) set-aside subcontracting requirement in a prime contract let out for bid by the CRDA. We conclude that the CRDA's set-aside program cannot withstand the strict scrutiny analysis set forth in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), because it is not narrowly tailored to achieve its intended result. Specifically, it is overinclusive as to the minorities who may benefit from the program. Because we conclude that the program fails to meet the "narrowly tailored" prong of the Croson test, we need not decide on this appeal whether the program is justified by a compelling governmental interest, including identification of the appropriate governmental unit, whether there are particularized findings in the record that the CRDA has engaged in discrimination in contracting or has become a passive participant in private discrimination in contracting, or whether the CRDA failed to sufficiently utilize race-neutral alternatives. We leave these important issues for another day.

I.

A.
These are the facts relevant to consideration of the narrow issue we have identified. *257 The CRDA was created by L. 1984, c. 218 "in, but not of, the Department of Treasury." N.J.S.A. 5:12-153(a). The Authority's purposes include maintaining public confidence in the casino gaming industry; directly facilitating the redevelopment of existing blighted areas in Atlantic City "by providing eligible projects in which casino licensees shall invest"; providing loans and other financial assistance for the acquisition, rehabilitation, construction, or repair of buildings or facilities to provide housing, commercial facilities, solid waste disposal facilities and roads, highways and bridges; and assisting commercial enterprises and local governmental units by providing financing for various projects. N.J.S.A. 5:12-160. Additionally, the CRDA is authorized to invest in eligible projects, issue bonds, guarantee obligations and enter into contracts. It is funded by charges and taxes imposed on New Jersey's casino industry. N.J.S.A. 5:12-144.1, -161.1 to .2, -173.1 to -.5.
In 1983, the Legislature enacted the Small Business Set Aside Act. N.J.S.A. 52:32-17 to -31, L. 1983, c. 482. As part of the law, all state agencies were required to establish a goal of setting aside at least 15% of their contracts for small business. N.J.S.A. 52:32-21.
The 1984 enabling legislation creating the CRDA included a minority and women's set-aside of twenty percent. N.J.S.A. 5:12-181b. The statute, in turn, incorporated by reference N.J.S.A. 34:1B-47 and -48, part of the enabling legislation of the New Jersey Development Authority for Small Businesses, Minorities and Women's Enterprises. Among the findings of incorporated law was that "due to a historical legacy of disregard and discrimination, minorities and women control a disproportionately small fraction of the productive resources of the State and are therefore largely excluded from the mainstream of the overall economy." N.J.S.A. 34:1B-47c. The term "minority" was broadly defined, and included:
(1) Black, which is a person having origins in any of the black racial groups in Africa; or
(2) Hispanic, which is a person of Spanish or Portuguese culture, with origins in Mexico, South or Central America, or the Caribbean islands, regardless of race; or
(3) Asian-American, which is a person having origins in any of the original peoples of the Far East, Southeast Asia, and Indian subcontinent, Hawaii, or the Pacific Islands; or
(4) American Indian or Alaskan native, which is a person having origins in any of the original peoples of North America.
[ N.J.S.A. 34:1B-48d.][1]]
Minority and women's businesses were defined as businesses in which minorities or women hold 51% of the beneficial ownership, and in which the majority of the management is composed of either minorities or women. N.J.S.A. 34:1B-48e, h.
Enacted on the same date as the above legislation, L. 1985, c. 384, which amended the Small Business Set Aside Act, renamed the Set-Aside Act for Small Businesses, Female Businesses, and Minority Businesses (Set-Aside Act), N.J.S.A. 52:32-17, and established as goals for state contracting agencies that they award "at least 7% of their contracts for minority businesses and at least 3% of their contracts for female businesses" (WBE), N.J.S.A. 52:32-21a. Pursuant to these *258 goals, "a total of at least 25% of the State's procurement contracts shall be awarded to small businesses, minority businesses, and female businesses." N.J.S.A. 52:32-21b. In addition, the law amended the legislative declarations to provide:
The Legislature declares that the existence of a strong and healthy free enterprise system is directly related to the well-being and competitive strength of small business, female business and minority business concerns and to the opportunity for small business, female business and minority business to have free entry into business, to grow and to expand; and finds that the State must ensure that a fair proportion of the State's total purchases and contracts for construction, property and services is placed with small business, female business and minority business concerns.
[ N.J.S.A. 52:32-18.]
A minority business was defined as a "business which has its principal place of business in the State, is independently owned and operated and at least 51% of which is owned and controlled by persons who are black, Hispanic, Portuguese, Asian American, American Indian or Alaskan natives." N.J.S.A. 52:32-19g.
In 1986, the CRDA adopted regulations which mirrored the set-aside provision contained in N.J.S.A. 5:12-181b, requiring a 20% M/WBE set-aside on contractors, casino licensees and applicants for funding. 18 N.J.R. 852(a) (April 3, 1986); 18 N.J.R. 1405(a) (July 7,1986). This regulation was readopted in May 1992. 24 N.J.R. 3535(a) (October 5, 1992). In 1997, the regulations were again amended to reduce the MBE requirement to 7%. 29 N.J.R. 4562(b) (September 26, 1997).
On August 14, 1989, in response to the Croson decision, Governor Kean signed Executive Order 213, which suspended the State's MBE set-aside program and created the Governor's Study Commission on Discrimination in Public Works Procurement and Construction Contracts (Commission). The Commission was continued under executive orders signed by Governor Florio.
The Commission report (Report), dated February 22, 1993, found "statistically significant disparities between the volume of State funds spent on procurement and construction and the percentage of funds going to minority and women businesses, and the availability of such firms in the market." It found that these disparities were attributable to a number of State practices and private practices passively supported by the State. The Report concluded that "[i]n addition to underutilizing women and minority prime contractors, the State has passively participated in discrimination practiced by some members of the construction industry in New Jersey." The Report found that various State practices adversely affected MBE's, including the "old boy" network, waivers of bidding requirements for professional services contracts, and requirements for bid and performance bond requirements.
With respect to contracting, the Report reached specific conclusions regarding the bidding process as well as the history of discrimination in unions and contractors. The Report stated: "The State of New Jersey has infused tax dollars into a discriminatory industry by contracting with the construction industry which has, both historically and currently, excluded women and minorities from employment, apprenticeship programs and subcontracting opportunities." It further observed that many of the discriminatory practices "are traceable to the State directly or are tolerated and supported by State governmental units."
*259 Based on the evidence provided, the Report concluded that New Jersey has a compelling interest in eliminating the prior and current discrimination uncovered, and recommended that set-asides for contracting be 7% for MBE's. The Report explicitly stated that the State should set goals on state programs for economic development that are primarily supported by the issuance of public bonds or grants, and concluded that a 15% set-aside for MBE's in construction contracting "may be legally justifiable."
The Report made recommendations to remedy the pattern of discrimination found and to promote the inclusion of MBE's in the economic life of the State. It further recommended that the definition of "minority business" in the Set Aside Act be amended to include only African-Americans, Hispanics and Asian-Americans. In addition, the Report directed that all set-aside programs have sunset clauses.
Based on the Report, Governor Florio issued Executive Order No. 84 on March 5, 1993, reestablishing a 7% MBE set-aside for State purchasing programs and for State agencies and commissions. Despite various feints at legislative action in this area, the Legislature has not enacted any legislation adopting the Report or its findings.
On April 6, 2000, Governor Whitman signed Executive Order No. 112, establishing a new Study Commission to investigate, research, and report on the nature and scope of any past or present discrimination in State employment and contracting.

B.
Subsequent to the issuance of Executive Order No. 84, the CRDA adopted a resolution incorporating the concept of utilizing set-aside programs with regard to M/WBE's as set forth in the order and the Set-Aside Act. In its 1999 set-aside plan, the CRDA reiterated reliance on the 7% MBE figure, as set forth in the Set-Aside Act, N.J.A.C. 17:14, and the order for its contracts and subcontracts.
The Commission Report prompted regulatory changes in the definition of minorities. As the trial judge stated in his opinion:
After the Commission Report was issued changes to the then existing regulations were proposed. One of the responses to the public comments received in connection with the adoption of the regulatory amendments states:
The Governor's Study Commission on Discrimination in Public Works Procurement and Construction Contracts (Study Commission) only found evidence of discrimination in public contracting against African American, Hispanic and Asian American-owned firms and women-owned firms of all races and ethnicity. Based on the lack of sufficient data at this time, the Commission did not find evidence of discrimination against the other groups listed in the definition of the term "minority business," that is, Portuguese, Native American and Alaskan native-owned firms. City of Richmond v. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) requires that these rules be narrowly tailored to address the discrimination revealed by the Study Commission's study to be constitutionally valid.
[27 N.J.R. 135(a).]
As a result of the findings of the Study Commission, regulations were changed to redefine minorities to exclude American Indians, Alaskan Natives and Portuguese. See supra, N.J.A.C. 17:14-1.2 and N.J.A.C. 12A:10-1.2. The Set-Aside Act, however, continues *260 to include as minorities persons who are Black, Hispanic, Portuguese, Asian American, American Indian and Alaskan Natives. N.J.S.A. 52:32-19(g).
In May 1999, the CRDA issued an advertisement for bids for the Civil Rights Garden component of the Carnegie Library Project to restore and renovate a library building on CRDA-owned property in Atlantic City. The project involved "the construction of foundations, fencing, brick paths, a pool of water with mechanicals, lighting, and extensive landscaping." The advertisement noted that "the contract will require the bidder to h[a]ve 30% of the total contract value set aside for [MBE] participation."
According to Yvonne Bonitto-Doggett, the CRDA's Deputy Director, a prime consideration in setting the 30% goal for the Civil Rights Garden project was the need to meet the overall 7% MBE annual goal. However, Bonitto-Doggett stated that she had not seen any evidence of discrimination on the part of the CRDA in its purchasing practices, or on the part of contractors or subcontractors doing business with the CRDA. In addition, she stated that she has not seen any acts of discrimination on the part of applicants for CRDA funding. Other considerations included the type of project (apparently, referring to the name of the project), and the availability of contractors. In any event, sealed bids were required to be received by the CRDA by 4:00 p.m. on June 4, 1999.
On June 4, 1999, the CRDA received three bid proposals. After rejecting a nonresponsive bid, the CRDA determined that plaintiff's bid was the lowest responsive bid and that it satisfied the 30% MBE set-aside goal established for the contract. On June 15, 1999, the CRDA adopted a resolution approving plaintiff's bid.

C.
Immediately prior to the bidding, plaintiffs filed a complaint in lieu of prerogative writ against defendants seeking injunctive relief and a judgment declaring that the 30% set-aside bid requirement and the applicable regulation, N.J.A.C. 19:65-4.1, violated their rights to equal protection under the United States and New Jersey Constitutions, U.S. Const. amends. V, XIV, § 1; N.J. Const. art. I, ¶ 1; 42 U.S.C.A. §§ 1981 and 1983; and New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. Plaintiffs' application to enjoin the bidding was denied.
Plaintiffs then amended their complaint and sought a judgment declaring the Set-Aside Act and various regulations contained in N.J.A.C. 12A:10A-4, N.J.A.C. 17:14-4, and N.J.A.C. 19:65-4.1 unconstitutional.
Following cross-motions for summary judgment, the motion judge issued a written decision granting plaintiffs' motion. The judge held that the CRDA's MBE set-aside program violates the Equal Protection Clauses of the United States Constitution, U.S. Const. amends. V, XIV, § 1, and permanently enjoined the CRDA from utilizing its set-aside program.
Defendants appealed. Subsequently, we granted leave to the NAACP Legal Defense and Educational Fund and to the Utility and Transportation Contractors Association of New Jersey, Inc. to appear as amici curiae.

II.
This background provides the predicate facts for the issues in dispute which arise in the context of a new CRDA project.
Under the Equal Protection Clause of the Fourteenth Amendment, any preference based on racial or ethnic criteria is subject to strict scrutiny. Croson, *261 supra, 488 U.S. at 493, 109 S.Ct. at 721, 102 L.Ed.2d at 881-82; Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260, 268 (1986); Contractors Ass'n of E. Pennsylvania v. City of Philadelphia, 91 F.3d 586, 596 (3d Cir.1996), cert. denied, 519 U.S. 1113, 117 S.Ct. 953, 136 L.Ed.2d 840 (1997). There are two elements to this examination: first, any racial classification must be justified by a compelling governmental interest; second, the means chosen by the governmental entity to effectuate its purpose must be narrowly tailored to achieve that goal. Wygant, supra, 476 U.S. at 274, 106 S.Ct. at 1847, 90 L.Ed.2d at 268.
While the parties strenuously argue the merits of both prongs, we determine that the CRDA's set-aside program fails to meet the second prong. We recognize that any strict scrutiny analysis requires the initial identification of a compelling state interest. See Contractors Ass'n, supra, 91 F.3d at 599 ("[A] court cannot conduct the strict scrutiny review required by Croson without first identifying with specificity the discrimination allegedly giving rise to the compelling state interest."). However, for the limited purposes of our analysis, we will assume that the first prong of the Croson analysis has been satisfied, a subject of considerable debate among the parties. Accordingly, we limit our review to the breadth of the set-aside program as dispositive of the issues here.
Addressing the issue of narrow tailoring, the judge determined there was a constitutional violation because the definitions of "minorities" in the legislation were not narrowly tailored given that the regulations continue to include any persons of certain cultures or origins without any evidence in the Report of identifiable discrimination in the construction industry with regard to those groups. He found:
If the court were to assume, however, that the changes in administrative regulations were sufficient to validate the Authority's use of N.J.S.A. 5:12-181 and/or N.J.S.A. 52:32-17, et seq., to implement a set-aside plan, the plan would still fail since the definitions of minorities are not narrowly tailored to survive a constitutional challenge. The definition of a minority business under N.J.S.A. 5:12-185(c) continues to include American Indians and Alaskan Natives, persons of Portuguese culture, and persons with origins in Hawaii or the Pacific Islands. N.J.S.A. 52:32-19(d) includes Portuguese, American Indicans, and Alaskan Natives. The amendments to N.J.A.C. 17:14-1.2 have deleted American Indians, Alaskan Natives and Portuguese, but its definition of Latinos includes any person of Spanish culture or origin. Included in the definition of Asian Americans are persons from Hawaii or the Pacific Islands. It cannot be said that these definitions are narrowly tailored as there was no evidence in the Commission Report of identifiable discrimination in the construction industry in this State against those from Hawaii and the Pacific Islands, persons of Portuguese culture, "others of Spanish culture of origin," American Indians or Alaskan Natives. This hodgepodge of statutory and regulatory definitions has created uncertainty as to who may be eligible for race based classifications. The racial groups include minorities who have not been found to have suffered discrimination in the State. There is no reasonable assurance that the race based programs will accomplish the objective of remediating discrimination against the very groups who have been the subject of past discriminatory conduct. To paraphrase the Croson Court, if, for example, the set-aside plan is narrowly tailored to compensate African *262 American, Hispanic and Asian American contractors for discrimination they previously experienced in the letting of public contracts in New Jersey, why are they asked to share their remedial relief with American Indians or Alaskan Natives who have not experienced similar discriminatory treatment in this State? Croson, supra, 488 U.S. at 506, 109 S.Ct. at 728, 102 L.Ed.2d at 890. To allow minority groups who have not been subject to discriminatory conduct to gain an advantage at the expense of other groups who similarly have not been subject to discriminatory conduct denies the latter group equal protection under the law. The remedial plan is not narrowly tailored to fit the harm. In the absence of narrowly tailored definitions, the remedy is societal in scope rather than injury specific, and the regulations as applied to the Authority set-aside plan cannot withstand a constitutional challenge.
The 1997 amendment to the regulations adopted the rules promulgated jointly by the Department of Commerce and Economic Development and the Department of Treasury. A review of those rules does not make the picture any clearer. N.J.A.C. 12A:11-1.2, a Commerce Commission regulation, defines Hispanic as including a person of Portuguese culture. Another Commerce Commission regulation, N.J.A.C. 12A:10A-1.2, includes Hawaiians and natives of the Pacific Islands as Asian Americans, and others of Spanish culture or origin as Latinos. As is the case with N.J.S.A. 5:12-185(c), N.J.S.A. 52-32-19(d) and N.J.A.C. 17:14-1.2, none of these groups were found by the Study Commission to have suffered discrimination in this State. The Authority cannot pick and choose which minority groups it chooses to favor. There must be an exact connection between justification and classification. Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902; Adarand, supra, 515 U.S. at 236, 115 S.Ct. at 2117, 132 L.Ed.2d at 188. When the definitions include a broad range of minority groups, some of whom have not been shown to have suffered discrimination, the regulations focus on societal discrimination in general, rather than identifiable discrimination in particular.
The CRDA contends that the trial judge erred in determining that the set-aside provisions in question were not narrowly tailored. In support, the CRDA argues that the provisions utilize race-neutral means in addition to the racial set-asides; utilize a flexible goal rather than a rigid quota; and are limited both as to time and geography. Any overinclusiveness as to the minorities covered by the statute can, according to the CRDA, be cured by application of the relevant administrative regulations or by judicial surgery.
In response, plaintiffs contend that the set-aside program is not narrowly tailored because it is overinclusive as to covered minorities, fails to use race-neutral means, and has no sunset and periodic evaluation provisions.
The CRDA implicitly concedes overinclusiveness with respect to the definition of "minority" in the applicable statutes because of the inclusion of minorities not found by the Report to have been subject to discrimination. In fact, elements of the statutory scheme in question have been held to be overinclusive. See Ass'n For Fairness in Bus. v. New Jersey, 82 F.Supp.2d 353, 362-63 (D.N.J.2000) (holding N.J.S.A. 5:12-185 and N.J.S.A. 52:32-19g to be overinclusive because there was no evidence in the record, including the Report, of discrimination against companies run by individuals of *263 Native American, Native Alaskan, Hawaiian, or Portuguese descent). The same overinclusiveness is present in the definition of minority incorporated in N.J.S.A. 5:12-181 by N.J.S.A. 34:1B-48.
The CRDA maintains any overinclusiveness is cured by its adherence to the definitions of "minority" in the applicable regulations, specifically N.J.A.C. 17:14-1.2, which defines the term, based on the findings of the Report, to include African Americans, Latinos, and Asian Americans. However, even assuming that the definition, on its face, cures any overinclusiveness, it neither resolves the issue nor the conflict between the statute and the regulations. By regulation and practice, the CRDA does not apply the definition of minority contained in the statutes, a factor fatal to its position. Simply stated, the CRDA does not have the authority to deviate from the statutorily-defined minorities eligible for inclusion in a set-aside program.
The law is well settled. "To be valid, a regulation must be within the fair contemplation of the delegation of the enabling statute." Lewis v. Catastrophic Illness in Children Relief Fund, 336 N.J.Super. 361, 369-70, 764 A.2d 1035 (App.Div. 2001). An administrative agency may not extend a statute to give it greater effect than its language permits, GE Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 306, 625 A.2d 468 (1993); Serv. Armament Co. v. Hyland, 70 N.J. 550, 563, 362 A.2d 13 (1976), or "narrow or restrict the scope of an otherwise specific and clearly-worded statute," Terry v. Harris, 175 N.J.Super. 482, 496, 420 A.2d 353 (Law Div.1980). That is, when the provisions of the statute are clear and unambiguous, a regulation cannot amend, alter, enlarge or limit the terms of the legislative enactment. New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 82, 411 A.2d 168 (1980); Hotel Suburban Sys., Inc. v. Holderman, 42 N.J.Super. 84, 90, 125 A.2d 908 (App.Div.1956). Where there is a conflict, the statute prevails over the regulation. Siri v. Bd. of Trs. of the Teachers' Pension & Annuity Fund, 262 N.J.Super. 147, 152, 620 A.2d 440 (App.Div.1993). As has been observed: "Statutes, when they deal with a specific issue or matter, are the controlling authority as to the proper disposition of that issue or matter. Thus, any regulation or rule which contravenes a statute is of no force, and the statute will control." Terry, supra, 175 N.J.Super. at 496, 420 A.2d 353. In sum, because the purported compliant regulations alter the relevant statutes, we reject the view that the overinclusiveness complained of can be cured by this questionable regulatory scheme.
The CRDA asserts that even assuming this to be true, overinclusiveness may be cured by "judicial surgery." We also agree with the trial judge's rejection of that view.
The judge rejected CRDA's request that he perform such "surgery" on the offending provisions in the statutes and regulations and rewrite the definitional scheme to comport with the specific findings of the Study Commission. He found that was a legislative, rather than judicial function "Striking the inconsistent portions of both the statutes and the regulations would be tantamount to changing the legislative intent behind the original statutory enactments."
Pursuant to N.J.S.A. 1:1-10, a court has the power to declare a portion of a statute unconstitutional, while leaving the remainder of the law intact. "In appropriate cases, a court has the power to engage in `judicial surgery,' or the narrow construction of a statute, to free it from constitutional doubt or defect." Chamber *264 of Commerce, supra, 82 N.J. at 75, 411 A.2d 168. Whether such judicial surgery should be utilized depends upon whether the Legislature would have wanted the statute to survive. Ibid. That issue raises the question of severability, namely, "whether the objectionable feature of the statute can be ex[ ]cised without substantial impairment of the principal object of the statute." Affiliated Distillers Brands Corp. v. Sills, 60 N.J. 342, 345, 289 A.2d 257 (1972). Courts will sever a statutory provision "where the invalid portion is independent and the remaining portion forms a complete act within itself." Inganamort v. Borough of Fort Lee, 72 N.J. 412, 423, 371A.2d 34 (1977).
The judge, in declining to engage in judicial surgery, further noted that "the offending provisions in the statutes and regulations are so widespread that judicial surgery would be inappropriate. What the Authority is asking the court to do is rewrite the statutory and regulatory definitional scheme to comport with the specific findings of the Study Commission. That is a legislative, not a judicial, function."
We need not detail the obvious conflicts in the statutes and regulations in question, as the CRDA concedes the conflict. We observe, for example, that while it would not be difficult to excise American Indian and Alaskan native from the definition of "minority," a problem arises with respect to Hispanics and Asian Americans due to the differing definitions of those terms in the various statutes. For example, Portuguese is included within the definition of Hispanic under N.J.S.A. 5:12-185c and N.J.S.A. 34:1B-48d(2), but not under N.J.S.A. 52:32-19g. Judicial surgery here presents more of a risk to the program than a remedy.
There are additional concerns militating against judicial surgery. There are inconsistencies among the pertinent statutes and regulations, as to which minorities may be entitled to be included in a set-aside program. These inconsistencies are not only troubling, but support the conclusion that the lack of narrow tailoring in this instance cautions against judicial tinkering. See Adarand Constructors, Inc. v. Pena, 965 F.Supp. 1556, 1581 (D.Colo.1997), rev'd on other grounds sub nom. Adarand Constructors, Inc. v. Slater, 228 F.3d 1147 (10th Cir.2000), cert. granted in part sub nom. Adarand Constructors, Inc. v. Mineta, ___ U.S. ___, 121 S.Ct. 1598, 149 L.Ed.2d 464 (2001) ("The inconsistencies between the[ ] statutes and regulations and the resultant uncertainty as to who may or may not participate in the race-based ... program preclude a finding of narrow tailoring.").
Ultimately, compliance with Croson will require legislative intervention on issues broader than the definition of "minority." For purposes of this appeal, the present statutory definition of minority presages the unconstitutionality of the set-aside program as applied to CRDA.
Affirmed.
NOTES
[1] This definition is in accord with the definition of "minority" adopted by L. 1985, c. 539, and codified at N.J.S.A. 5:12-185c, relating to affirmative action contracting in the casino industry.