NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4216-12T1

CLAIR W. FLINN and VALERIE K.
FLINN; ROBERT C. MCGIRR;
R. REUEL STANLEY; KEVIN SHULMAN
and GINA SHULMAN; JOSEPH
BUCKELEW; JOHN R. O'BRIEN;
G. GERARD BARNETT and MARJORIE
P. BARNETT; JOHN MORRONGIELLO
and SUSAN MORRONGIELLO;
ROSEMARIE LAROCCA; JAMES C. DAY
and KATHLEEN DAY; JOSEPH C.
ROSELLE and ANITA ROSELLE;
HENRY DABROWSKI and IRENE W.
DABROWSKI; ROBERT GROSSMAN and
GALE GROSSMAN; D. KASUN
ASSOCIATES; ROBERT A. SHEKITKA
and EDA SHEKITKA;[1] JOHN CUTILLO
and PRUDENCE M. CUTILLO; and
CARMELO CONTRINO and SUSAN
CONTRINO,

     Plaintiffs-Appellants,

v.

AMBOY NATIONAL BANK and
AB MONMOUTH, LLC,

     Defendants-Respondents.

---

| APPROVED FOR PUBLICATION |
| :---: |
| July 2, 2014 |
| APPELLATE DIVISION |

Argued May 28, 2014 - Decided July 2, 2014

Before Judges Messano, Sabatino and
Rothstadt.

---

[1] This plaintiff's name is alternatively spelled in the record as
Edna Shekitka and Eda Shikitka.

On appeal from Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. C-159-12.

Richard P. Coe, Jr., argued the cause for appellants (Kennedy, Wronko, Kennedy and Weir & Partners LLP, attorneys for appellants; Mr. Coe and E. Richard Kennedy, on the brief).

Catherine J. Bick argued the cause for respondents (Giordano, Halleran & Ciesla, PC, attorneys; J. Scott Anderson and Ms. Bick, on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

This case involves disputes between plaintiffs, who are unit owners in a partially-completed condominium project, and defendants, a bank and its wholly-owned subsidiary that took over the project after the original developer defaulted on its loans.

In their complaint, the unit owners sought to be granted control over the condominium association pursuant to N.J.S.A. 46:8B-12.1(a) because defendants allegedly have ceased building more units or offering units for sale in the ordinary course of business. Plaintiffs further alleged that defendants made or are responsible for misrepresentations in the sale documents, have mismanaged the project, have failed to make required payments, and have otherwise breached their fiduciary duties.

The trial court granted defendants' motion to dismiss the complaint in its entirety with prejudice, and plaintiffs appealed. We reverse the trial court's dismissal order and remand for further proceedings.

## I.

Although the record is not fully developed and is essentially still in the pleadings stage, we derive the following background information from the documents furnished on appeal. Plaintiffs are a group of twenty-eight owners of eighteen[2] condominium units in The Monmouth Condominium ("The Monmouth"), a mixed-use, age-restricted residential condominium project located in Wall Township. They appeal the trial court's order dismissing with prejudice their five-count complaint against defendants, Amboy National Bank ("Amboy Bank") and AB Monmouth, LLC ("AB Monmouth"), a wholly-owned subsidiary of Amboy Bank.

### The Project

As initially contemplated, The Monmouth was to feature ninety-six luxury residential units housed in sixteen buildings, together with other structures and improvements for common use and enjoyment. However, as we describe further, infra,

---

[2] Defendants' brief incorrectly states that plaintiffs own only sixteen units, but that tabulation is contradicted by an exhibit attached to one of the certifications.

financial hardship befell the original developer of the project, and it failed to construct forty-eight of the planned ninety-six units. Ultimately, the property was foreclosed upon by Amboy Bank, which had financed the project. In the wake of the sheriff's sale, ownership of The Monmouth was transferred to defendants. As of the time of those foreclosure proceedings, the original developer had sold only twenty-four of the forty-eight constructed units.

Following the change in ownership, eight more units were sold, bringing the total units sold to thirty-two out of forty-eight constructed units. The remaining sixteen units have been leased. As for the other forty-eight units that were planned for completion, they remained unconstructed, at least as of the time of the trial court's decision.

Each of the purchased units in The Monmouth is owned in fee simple by the residents, who concomitantly have an undivided interest in the common elements of the condominium complex, proportionate with their share of the total units.

The Monmouth Condominium Association, Inc. (the "Monmouth Association"), which is not a party to this litigation, is the condominium's association "responsib[le] for the administration, operation, and management of [The Monmouth] and the recreation facilities and other improvements intended for the common use

4                                          A-4216-12T1

and enjoyment of the residents of [The Monmouth]." Any person who owns a unit in The Monmouth is automatically a member of the association, and only an owner may be a member.

The Monmouth Association is operated by a three-member to five-member board of trustees (the "board," or the "governing board"), whose primary duty is to administer the association and to preserve and maintain the common elements for use and enjoyment of the residents in The Monmouth. The common elements, as defined in the master deed, include streets, alleys, walkways, common parking areas, public utilities connections, stairways, steps, landings, as well as amenities such as a swimming pool and club room.

The Oakshire Group, LLC ("Oakshire") was the original developer of the condominium project. Oakshire first registered the project with the New Jersey Department of Community Affairs with the filing of, among other things, a public offering statement (the "Oakshire POS") dated February 4, 2004. The Oakshire POS functioned as a disclosure statement to potential buyers, providing certain salient details about The Monmouth, such as a description of the interests to be offered, the management and operation of common elements, easements and encumbrances, and applicable warranties.

Oakshire later filed a master deed (the "Oakshire Master Deed") for The Monmouth dated October 26, 2005. The Oakshire Master Deed functioned as the legal instrument that, when recorded with the county, established the condominium form of ownership for the land and the improvements located thereon.

The Oakshire Master Deed likewise contained pertinent information about The Monmouth, such as descriptions of the individual units, descriptions of the common elements, unit owner association voting rights, powers of attorney, restrictions, and statements of sponsor's rights and obligations. Notably, a section of the Oakshire Master Deed, entitled "ARTICLE XV. SPONSOR'S RIGHTS AND OBLIGATIONS," contained several provisions on liability of the project's transferor and successors. Those provisions included the following pertinent language:

> 15.04 Liability of Transferor. Upon transfer of any such Special Sponsor Right, the liability of the transferor is as follows:
>
> (a) A transferor is not relieved of any obligation or liability arising before the transfer and remains liable for warranty obligations imposed upon him. Lack of privity does not deprive any Unit Owner of standing to bring an action to enforce any obligation of the transferor.
>
> (b) If a transferor retains any such Special Sponsor Right, or if a successor to any such Special Sponsor Right is an

affiliate of the Sponsor, the transferor is subject to liability for all obligations and liabilities imposed on a Sponsor by law or by the Master Deed, arising after the transfer, and is jointly and severally liable with the successor for the liabilities and obligations of the successor which relate to the Condominium.

(c)   A transferor who retains no such Special Sponsor Rights has no liability of any act or omission or any breach of a contractual or warranty obligation arising from the exercise of any such Special Sponsor Right by a successor Sponsor who is not an affiliate of the transferor.

. . . .

15.07   Liability of Successors.   The liabilities and obligations of persons who succeed to all Special Sponsor Rights are as follows:

(a)  A successor to all such Special Sponsor Rights who is an affiliate of the Sponsor is subject to all obligations and liabilities imposed on any Sponsor by law or by the Master Deed.

(b)  A successor to all such Special Sponsor Rights, . . . who is not an affiliate of Sponsor, is subject to all obligations and liabilities imposed upon Sponsor by law or the Master Deed, but he is not subject to liability for misrepresentations or warranty obligations on improvements made by any previous Sponsor or made before the Condominium was created, or for a breach of fiduciary obligation by any previous Sponsor.

[(Emphasis added).]

7                                    A-4216-12T1

<u>The Loan Agreement and Oakshire's Default and Foreclosure</u>

Amboy Bank and Oakshire entered into and executed a loan agreement (the "Oakshire Loan Agreement"), providing for Amboy Bank to finance Oakshire's development and construction of The Monmouth. In exchange for that financing, Oakshire executed and delivered to Amboy Bank a mortgage and security agreement which granted the bank a first mortgage lien interest on The Monmouth. At some point following the execution of the mortgage, Amboy Bank apparently released twenty-two of the units from the lien, leaving seventy-four units in The Monmouth still subject to it.

In the ensuing years, Oakshire experienced financial difficulties and defaulted under the terms of the Oakshire Loan Agreement. As a result, Amboy Bank filed a complaint for foreclosure in October 2007 against Oakshire and other defendants. By that point, only twenty-four of the units in The Monmouth had been sold.

In January 2008, the Chancery Division judge in the foreclosure case[3] entered a custodial receivership order. Among other things, that order appointed a third-party entity as the custodial receiver for The Monmouth. The order also enjoined

---

[3] A different judge subsequently presided over the present lawsuit.

A-4216-12T1

Oakshire from incurring further debts on the property. The duties of the custodial receiver were subsequently expanded.

In November 2008, the Oakshire POS was amended (the "Amended Oakshire POS") to reflect certain events that had followed its default of the Oakshire Loan Agreement. In relevant part, the Amended Oakshire POS disclosed to potential buyers that Amboy Bank had brought foreclosure proceedings against Oakshire, that the bank had elected to proceed with a sheriff's sale to acquire the property, that the property was under the care of a custodial receiver, and that all deposit monies paid by potential purchasers would be held in escrow pending the resolution of the foreclosure proceedings.

At the ensuing sheriff's sale held on November 2, 2009, Amboy Bank was the successful bidder to purchase the seventy-two remaining unsold units at The Monmouth. The seventy-two units were then conveyed to AB Monmouth[4] via Sheriff's Deed dated November 19, 2009, and recorded in the Monmouth County Clerk's Office on December 9 and December 24, 2009. By separate instrument, the Sheriff's Deed conveyed the Special Sponsor

---

[4]  As we previously noted, AB Monmouth is a wholly-owned subsidiary of Amboy Bank. It is unaffiliated with Oakshire. Amboy is the sole member of AB Monmouth, a New Jersey limited liability company ("LLC").

Rights, described _supra_, in Article XV of the Oakshire Master Deed.

AB Monmouth thereafter issued a revised Public Offering Statement (the "AB Monmouth POS") on June 21, 2010. The AB Monmouth POS detailed the events that led to AB Monmouth's holding of title to The Monmouth. The document also contained the following relevant summary of the status of the project:

> At this time, Oakshire has completed construction of 8 Buildings containing 48 Units (the "Oakshire Units") and common elements (the "Common Elements") serving the Condominium including all of the recreational amenities which include the 18-hole putting course, outdoor swimming pool, indoor swimming pool, and clubhouse ("Oakshire Common Facilities"). Oakshire previously sold 24 Oakshire Units, and 24 Oakshire Units remain unsold. As part of the within Registration, AB Monmouth is registering the 24 Oakshire Units that remain unsold along with the remaining 48 Units that are unbuilt. In the event that AB Monmouth does construct the AB Units, it will complete any associated Common Elements which were discussed in the Oakshire Public Offering Statement. AB Monmouth reserves the right to add up to the planned 48 Units in the 8 unbuilt buildings ("AB Units"), but is under no obligation to do so. Additionally, AB Monmouth reserves the right, with the approval of the necessary number of the Unit Owners of the 24 Oakshire Units not owned by AB Monmouth, and with such other required governmental approvals, to alter the configuration of the AB Units in the 8 unbuilt buildings and construct an additional 48 Units within the remaining 8 unbuilt buildings for a total of 144 Units in the Project.

Further, <u>AB Monmouth reserves the right</u>, with the approval of the necessary number of the Unit Owners, and with such other required governmental approvals, <u>to modify the age-restriction for the Project</u> to allow a certain percentage of Units, as specified more fully below, to be conveyed for occupancy by individuals under the age of fifty-five.

[(Emphasis added).]

<u>Plaintiffs' Complaint</u>

In October 2012, plaintiffs filed their complaint in the Chancery Division against Amboy Bank and AB Monmouth. Among other things, the complaint seeks an order requiring defendants to turn over control of the condominium association to the unit owners, in addition to statutory money damages. The record shows that seventeen of the named plaintiffs took title to their units before the Sheriff's Deed was conveyed to AB Monmouth. The complaint identifies each defendant, i.e., Amboy Bank and AB Monmouth, as a "Developer/Sponsor" of The Monmouth.

According to the complaint, since the time of title transfer of The Monmouth to AB Monmouth, eight more units in the condominium project had been sold, bringing the total number of units sold in the forty-eight units that have been built to thirty-two. Defendants do not dispute that fact, nor do they dispute the fact that the remaining sixteen units have been leased out. The complaint further alleges that of the forty-

eight remaining unbuilt units, defendants are no longer offering those units up for sale in the ordinary course of business.[5]

Count I of the complaint seeks the divestiture of defendants' control over the condominium association. That request is predicated upon proviso language within N.J.S.A. 46:8B-12.1(a), which plaintiffs contend requires a condominium developer to relinquish control of a condominium association when it no longer is building or offering condominium units for sale in the ordinary course of business.

Count II of the complaint seeks from defendants monetary damages and counsel fees, on the basis that the AB Monmouth POS contained material misrepresentations and omissions, in violation of N.J.S.A. 45:22A-37, a provision within the New Jersey Planned Real Estate Development Full Disclosure Act ("PREDFDA"), N.J.S.A. 45:22A-21 to -56.

Count III of the complaint alleges that defendants violated their financial obligations under N.J.A.C. 5:26-8.6(b), certain statutory provisions of the New Jersey Condominium Act ("NJCA"), N.J.S.A. 46:8B-1 to -38, (specifically N.J.S.A. 46:8B-3 and -6), and portions of the Master Deed.

---

[5] As discussed, infra, defendants strenuously dispute this latter contention alleging an ongoing failure to market the unsold units.

Count IV of the complaint alleges that defendants failed to pay for common expenses, as they were required to do under certain PREDFDA regulations, N.J.A.C. 5:26-8.6, -8.7(a), -8.7(c), and -8.7(d).

Lastly, Count V of the complaint alleges that defendants breached their fiduciary duties and that plaintiffs suffered damages as a result.

The Motion to Dismiss

Shortly after being served with the complaint, defendants moved for dismissal under Rule 4:6-2(e), arguing that the complaint failed to state viable claims upon which relief may be granted. Both sides filed certifications in support of their competing positions on the dismissal motion.[6] Following oral argument, the trial court issued a bench opinion dismissing all five counts of the complaint, specifically doing so "with prejudice."

As to Count I, the trial court held that a regulation cited by defendants, N.J.A.C. 5:26-8.4(d), required the unit owners to first approve, by a majority vote, a willingness to assume control over the association. The court determined that such a

_____

[6] Although these submissions asserted matters outside of the contents of the complaint, the trial court, with the mutual assent of counsel, did not convert the application to a Rule 4:46 motion for summary judgment. See R. 4:6-2(e) (last sentence).

13                                          A-4216-12T1

majority vote, as specified under the regulation, was a legal precondition to a judicial order for the turnover of control under N.J.S.A. 46:8B-12.1(a).

The court next dismissed Count II. It ruled, first, that plaintiffs had failed to plead their fraud claims with specificity as required under Rule 4:5-8(a). Second, the court found that AB Monmouth, under the terms of the Oakshire Master Deed and as a successor to Oakshire, could not be held liable for misrepresentations Oakshire made, and third, that plaintiffs were barred by PREDFDA's six-year statute of limitations, N.J.S.A. 45:22A-37(d). The court further concluded that plaintiffs' claims of misrepresentation were not cognizable in particular against co-defendant Amboy Bank, because the bank was "not a developer sponsor" of the condominium, and also because the bank, as a mere member of AB Monmouth, cannot be liable for that LLC's obligations.

Lastly, the court dismissed Counts III, IV, and V of the complaint, based on a determination that all of the plaintiffs lacked standing to bring those particular claims.

The trial court issued a corresponding order of dismissal that same day. The court thereafter denied plaintiffs' motion for reconsideration. This appeal followed.

## II.

On appeal, plaintiffs advance several arguments why the court's dismissal of their complaint, with prejudice, was in error.

As to their claim for control of the association, plaintiffs contend that the trial court erred in construing a regulation, N.J.A.C. 5:26-8.4(d), to constrain their statutory rights under N.J.S.A. 46:8B-12.1(a) to assume control of the condominium association when a developer has ceased building or marketing additional units.

With respect to their fraud claims, plaintiffs maintain that their complaint was sufficiently specific. However, if it was not, they urge that the preferred remedy under case law is to allow them to revise their complaint to be more specific, rather than to dismiss it conclusively "with prejudice." Plaintiffs do acknowledge that principles of standing and also the statute of limitations may disallow some of the unit owners presently named in the complaint from suing AB Monmouth for fraud. However, they contend that the trial court went too far in dismissing all of those claims. Instead, the court should have preserved the claims of the specific unit owners who are eligible to sue.

As to Counts III, IV, and V, plaintiffs argue that the trial court failed to recognize their ability under case law to sue derivatively on behalf of the association where, as here, the association remains in the control of the developer.

Lastly, plaintiffs submit that the trial court should have allowed the claims against Amboy Bank to proceed, despite the entity status of AB Monmouth as an LLC, because PREDFDA provides that a defendant that "directly or indirectly controls" a developer nonetheless may be liable for the developer's violations of the statute. See N.J.S.A. 45:22A-37(c).

## A.

We begin with a few general observations concerning the standards governing dismissal motions under Rule 4:6-2(e) and our scope of review of orders granting such motions.

"In reviewing a complaint dismissed under Rule 4:6-2(e) [the] inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989) (citing Rieder v. Dep't of Transp., 221 N.J. Super. 547, 552 (App. Div. 1987)).  The "essential test," Green v. Morgan Properties, 215 N.J. 431, 451 (2013), is "whether a cause of action is 'suggested' by the facts." Printing Mart, supra, 116 N.J. at 746 (quoting Velantzas v. Colgate-Palmolive Co., 109

N.J. 189, 192 (1988)).  "[A] reviewing court 'searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.'"  Ibid. (citing Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)).

In Rule 4:6-2(e) dismissals, "the [c]ourt is not concerned with the ability of plaintiffs to prove the allegation contained in the complaint."  Ibid. (citing Somers Constr. Co. v. Bd. of Educ., 198 F. Supp. 732, 734 (D.N.J. 1961)).  Instead, "'plaintiffs are entitled to every reasonable inference of fact[,]' . . . and '[t]he examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach.'"  Green, supra, 215 N.J. at 452 (quoting Printing Mart, supra, 116 N.J. at 746).

Notwithstanding this "indulgent standard," id. at 456, "[a] pleading should be dismissed if it states no basis for relief and discovery would not provide one." Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 113 (App. Div.), certif. denied and appeal dismissed, 208 N.J. 366 (2011); see also Sickles v. Cabot Corp., 379 N.J. Super. 100, 106 (App. Div.), certif. denied, 185 N.J. 297 (2005).  In those "rare

instances," Smith v. SBC Communications, Inc., 178 N.J. 265, 282 (2004), "[a] motion to dismiss pursuant to Rule 4:6-2(e) ordinarily is granted without prejudice." Hoffman v. Hampshire Labs, Inc., 405 N.J. Super. 105, 116 (App. Div. 2009) (emphasis added) (citing Smith, supra, 178 N.J. at 282).

Our review of the trial court's dismissal order in this context is de novo. A reviewing court "'appl[ies] a plenary standard of review from a trial court's decision to grant a motion to dismiss.'" Gonzalez v. State Apportionment Comm'n, 428 N.J. Super. 333, 349 (App. Div. 2012) (quoting Rezem Family Assocs., supra, 423 N.J. Super. at 114). We "owe[] no deference to the trial court's conclusions." Ibid.

Applying these well-established principles, we conclude that the trial court's "with-prejudice" dismissal of plaintiffs' complaint in its entirety was premature, overbroad, and, in certain respects, based on a mistaken application of the law. We now turn to the specific components of our conclusion.

B.

The trial court's dismissal of plaintiffs' request in Count I to gain control of the association was erroneous, for several reasons.

Under the applicable provisions of the NJCA, a condominium association is "responsible for the administration and

18                                                          A-4216-12T1

management of the condominium and condominium property, including but not limited to the conduct of all activities of common interest to the unit owners."  N.J.S.A. 46:8B-12; see also Thanasoulis v. Winston Towers 200 Ass'n, 110 N.J. 650, 656-57 (1988) ("The most significant responsibility of an association is the management and maintenance of the common areas of the condominium complex." (citation omitted)).  The association is thus charged with various duties, not the least of which include the maintenance of the common elements and the assessment and collection of funds for common expenses.  See N.J.S.A. 46:8B-14.

Each unit owner automatically retains an interest in the common elements by virtue of his or her holding title to individual units in the condominium.  See N.J.S.A. 46:8B-6.  The governing board of the association (or other similar governing body) manages the day-to-day functions of the association itself, which in turn maintains the common elements.  N.J.S.A. 46:8B-12.1.  Typically composed of three to five individuals, the governing board decides, for example, whether to enter into contracts with third parties, how much to set association fees and related assessments, and the manner in which to provide bookkeeping and other limited administrative services for the benefit of the association.  N.J.S.A. 46:8B-12.2.

The composition of the governing board is of particular importance both to unit owners and the developer, because they may at times have competing interests with respect to the manner in which common elements are to be managed or maintained. The NJCA dictates the apportionment of control between developer-appointed trustees and unit-owner-elected individuals on the governing board. Those statutory provisions, set forth in <u>N.J.S.A.</u> 46:8B-12.1(a), initially establish a lock-step, percentage-based method by which unit owners may gradually gain control of the association:

> <u>When unit owners other than the developer own 25% or more</u> of the units in a condominium that will be operated ultimately by an association, <u>the unit owners other than the developer shall be entitled to elect not less than 25% of the members of the governing board</u> or other form of administration of the association. <u>Unit owners other than the developer shall be entitled to elect not less than 40% of the members of the governing board</u> or other form of administration upon the conveyance of <u>50% of the units</u> in a condominium. <u>Unit owners other than the developer shall be entitled to elect all of the members of the governing board</u> or other form of administration upon the conveyance of <u>75% of the units</u> in a condominium.

[(Emphasis added).]

Apart from this lock-step construct, the last sentence of the first unnumbered paragraph of <u>N.J.S.A.</u> 46:8B-12.1(a) contains the following proviso, which creates a separate pathway

for unit owners to gain control. The proviso covers situations where, as is alleged here, the developer is not building and not marketing for sale additional units "in the ordinary course of business":

> However, when some of the units of a condominium have been conveyed to purchasers and none of the others are being constructed or offered for sale by the developer in the ordinary course of business, the unit owners other than the developer shall be entitled to elect all of the members of the governing board or other form of administration.
>
> [Ibid. (emphasis added).]

The statute grants the developer the right to elect at least one member of the board, but only if the developer is continuing to hold for sale at least one condominium unit:

> Notwithstanding any of the provisions of [N.J.S.A. 46:8B-12.1(a)], the developer shall be entitled to elect at least one member of the governing board or other form of administration of an association as long as the developer holds for sale in the ordinary course of business one or more units in a condominium operated by the association.
>
> [Ibid. (emphasis added).]

Plaintiffs claim in their complaint, and in their certifications opposing defendants' motion to dismiss Count I, that AB Monmouth and Amboy Bank were not, in fact, constructing or offering for sale any more units in The Monmouth. Defendants disputed that factual assertion in their own submissions. The

trial court did not resolve that factual disagreement because it concluded, as a matter of law, that plaintiffs were precluded from control of the association without first obtaining a majority vote of unit owners approving such a takeover.

Specifically, the trial court hinged its analysis on the PREDFDA regulation cited by defendants, N.J.A.C. 5:26-8.4(d). That provision is contained within N.J.A.C. 5:26-8.4, a lengthy regulation which reads in full as follows:

> (a) Irrespective of the time set for developer control of the association provided in the master deed, covenants and restrictions or other instruments of creation, control of the association shall be surrendered to the owners in the following manner:
>
> 1. Sixty days after conveyance of 25 percent of the lots, parcels, units or interests, not less than 25 percent of the members of the executive board shall be elected by owners;
>
> 2. Sixty days after conveyance of 50 percent of the lots, parcels, units or interests, not less than 40 percent of the members of the executive board shall be elected by the owners;
>
> 3. Sixty days after conveyance of 75 percent of the lots, parcels, units or interests, the developer's control of the executive board shall terminate at which time the owners shall elect the entire executive board.
>
> (b) Notwithstanding (a)1, 2 and 3 above, the developer may retain one member of the executive board so long as there are any

22

units remaining unsold in the regular course of business.

(c) In calculating the above percentages, it is presumed that they are calculated on the basis of the entire number of units entitled to membership in the association.

(d) A developer may surrender control of the executive board of the association prior to the time as specified, provided the owners agree by a majority vote to assume control.

(e) Upon assumption by the owners of control of the executive board of the association, the developer shall forthwith deliver to the association all items and documents pertinent to the association such as, but not limited to a copy of the master deed, declaration of covenants and restrictions, documents of creation of the association, by-laws, minute book, including all minutes, any rules and regulations, an accounting of association funds, association funds, all personal property, insurance policies, government permits, a membership roster and all contracts and agreements relative to the association.

(f) The association, when controlled by the owners, shall not take any action that would be detrimental to the sales of units by the developer and shall continue the same level of maintenance, operation and services as immediately prior to their assumption of controls, until the last unit is sold.

(g) From the time of conveyance of 75 percent of the lots, parcels, units or interests, until the last lot, parcel, unit or interest in the development conveyed in the ordinary course of business the master deed, by-laws or declaration of covenants and restrictions shall not require the affirmative vote of more than 75 percent of

the votes to be cast in order to amend the by-laws or rules and regulations.

(h) The developer shall not be permitted to cast any votes allocated to unsold lots, parcels, units or interest in order to amend the master deed, by-laws or any other document for the purpose of changing the permitted use of a lot, parcel, unit or interest, or for the purpose of reducing the common elements or facilities.

[(Emphasis added).]

In essence, the trial court concluded that before it could entertain a request by the plaintiff unit owners to assume control of the association, all of the owners, by a majority vote, must first consent to such a transfer of control in accordance with N.J.A.C. 5:26-8.4(d). The trial court's reliance on the regulation in this setting was misplaced.

The legislative intent underlying the transfer-of-control statutes, N.J.S.A. 46:8B-12.1 and -12.2, contemplates that unit owners should ultimately be vested with control of the association, rather than the developer, in order to safeguard their property interests as the people who own (and who, most likely, live in) the premises. The developer is not to retain control of the association once it becomes clear that the statutory criteria for the transfer of that control have been triggered.

As the Supreme Court has explained, "the statutory scheme is to vest <u>ultimate</u> responsibility for the management of common elements in the <u>unit owners</u> of each condominium. . . . [It] requires the association to act on behalf of its <u>unit owners</u> and gives primary responsibility to the association to protect <u>those</u> interests."  <u>Fox v. Kings Grant Maint. Ass'n</u>, 167 <u>N.J.</u> 208, 220 (2001) (emphasis added); <u>see also</u> <u>Port Liberte Homeowners Ass'n v. Sordoni Const. Co.</u>, 393 <u>N.J. Super.</u> 492, 503 (App. Div.) ("The unique relationship between a condominium association and a developer, created by statute, allows an association to step into the developer's shoes when control is passed to the association." (citing <u>N.J.S.A.</u> 46:8B-12.1(a))), <u>certif. denied</u>, 192 <u>N.J.</u> 479 (2007).  As the Court noted in <u>Fox</u>:

> <u>N.J.S.A.</u> 46:8B-12.1 and <u>N.J.S.A.</u> 46:8B-12.2 reflect more than the orderly transition of power between the developer and unit owners. <u>They demonstrate the Legislature's understanding that in a condominium community, the unit owners' interests take precedence over any outside interest, whether that interest is a developer, an umbrella association, or any other outside party.</u>  Furthermore, those provisions demonstrate that condominium ownership differs significantly from traditional forms of property ownership, and that because unit owners have an undivided interest in their community's common elements <u>any governance scheme that conflicts with the recognition of that interest is inconsistent with and in violation of the [NJCA]</u>.
>
> . . . .

25

> The [NJCA] contains no provision giving the developer the right to use the property interests of . . . unit owners as a bargaining chip for the developer's own interests. To the contrary, the Legislature included specific language in the [NJCA] to prevent a developer's lingering control over a condominium association.
>
> [Fox, supra, 167 N.J. at 225-26 (emphasis added).]

The customary manner in which the transfer of governance is to occur is specified in the lock-step provisions, which are contained in both N.J.S.A. 46:8B-12.1(a) and in the associated regulations set forth in N.J.A.C. 5:26-8.4(a). Those companion regulations prescribe that a specified percentage of the seats on the governing board "shall be surrendered" to the unit owners through an election held within sixty days of the conveyance of, respectively, twenty-five percent, then fifty percent, then seventy-five percent, of the units or other property interests. N.J.A.C. 5:26-8.4(a).

Apart from this lock-step mechanism, N.J.A.C. 5:26-8.4(d) adds a separate optional procedure, in which a project developer may voluntarily seek to cede control to the unit owners, if the unit owners agree by a majority vote to accept such control. The regulation specifies that the developer "may surrender" such control "prior to the time as specified [in the lock-step provisions]," but only "provided [that] the owners agree by a

majority vote to assume control."  N.J.A.C. 5:26-8.4(d).  The manifest purpose of this regulation[7] is to assure that if the developer wants to step out of the management of the association at a time earlier than contemplated under the percentage-based lock-step milestones described supra, it may do so, but only if a majority of the owners would prefer to assume such total control at that earlier stage.  Ibid.

We do not construe the "majority vote" regulatory procedure in N.J.A.C. 5:26-8.4(d) to curtail the unit owners' statutory rights established under N.J.S.A. 46:8B-12.1(a) to have control transferred to them in circumstances where the developer has, in effect, become dormant in ceasing the construction of more units or in marketing unsold units.  If the developer is, in fact, failing to build or advertise in the "ordinary course of business," then the proviso in N.J.S.A. 46:8B-12.1(a) authorizes a court to strip the developer of control involuntarily.  This transfer of control is mandatory, and not discretionary, given that the statute explicitly states that the unit owners "shall be entitled" to elect a certain number of board members at certain milestones.  N.J.S.A. 46:8B-12.1(a) (emphasis added); see also Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212

---

[7] Curiously, this regulation has no cognate provision in the relevant statutes.  There is no history of it in the New Jersey Register that provides any relevant insight about its origins.

<u>N.J.</u> 576, 587-88 (2013) ("[T]he Legislature's choice of the word 'shall,' [] is ordinarily intended to be mandatory, not permissive.").

In contrast, the regulation codified at <u>N.J.A.C.</u> 5:26-8.4(d) addresses a developer's <u>voluntary</u> decision to relinquish control over the condominium association. It provides that "[a] developer <u>may</u> surrender control of the executive board of the association <u>prior to the time as specified</u>,[8] provided the owners agree by a majority vote to assume control." (Emphasis added). "Under the 'plain meaning' rule of statutory construction, the word 'may' ordinarily is permissive[.]" <u>Aponte-Correa v. Allstate Ins. Co.</u>, 162 <u>N.J.</u> 318, 325 (2000).

Thus, under the terms of the regulation, a developer has the discretion to relinquish its control over to the governing board before it is otherwise required to do so by statute in the NJCA. However, the developer may not indiscriminately abdicate its control, and therefore its responsibility, of the association. Instead, the developer can only do so when a majority of unit owners vote to approve of that step. <u>N.J.A.C.</u> 5:26-8.4(d).

---

[8] This phrase obviously refers to the lock-step percentage milestones in <u>N.J.S.A.</u> 46:8B-12.1(a) and <u>N.J.A.C.</u> 5:26-8.4(a).

The trial court's erroneous interpretation of these provisions essentially allows a voluntary and optional procedure set forth in a regulation to trump a mandate called for by a statute. We reject that interpretation.

It is well settled that "when the provisions of the statute are clear and unambiguous, a regulation cannot amend, alter, enlarge or limit the terms of the legislative enactment." L. Feriozzi Concrete Co. v. Casino Reinvestment Dev. Auth., 342 N.J. Super. 237, 250-51 (App. Div. 2001) (citing N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n, 82 N.J. 57, 82 (1980); Hotel Suburban Sys., Inc. v. Holderman, 42 N.J. Super. 84, 90 (App. Div. 1956)). "Where there is a conflict, the statute prevails over the regulation." Id. at 251 (citing Siri v. Bd. of Trs. of the Teachers' Pension & Annuity Fund, 262 N.J. Super. 147, 152 (App. Div. 1993)). Moreover, "'[s]tatutes, when they deal with a specific issue or matter, are the controlling authority as to the proper disposition of that issue or matter. Thus, any regulation or rule which contravenes a statute is of no force, and the statute will control.'" Ibid. (quoting Terry v. Harris, 175 N.J. Super. 482, 496 (Law Div. 1980)).

For these reasons, we reject the trial court's conclusion that a majority vote of unit owners was required to accept

control of the association before the court was empowered to implement the transfer of control mandated by the proviso in N.J.S.A. 46:8B-12.1(a) for situations with a dormant developer. As a matter of law, such a majority vote is not required in this setting under the statute. Indeed, a significant number[9] of unit owners (twenty-eight) have implicitly displayed their acquiescence to the assumption of control by joining forces in this lawsuit as co-plaintiffs. Their legislatively-granted right to proceed with such a transfer of control must not be thwarted by a misapplication of N.J.A.C. 5:26-8.4(d).[10] Hence, Count I of the complaint should not have been dismissed, and certainly not in a conclusive manner "with prejudice."

That said, we cannot and do not resolve on the present record whether the "ordinary course of business" proviso in N.J.S.A. 46:8B-12.1(a) has actually been triggered. That disputed question cannot be answered by a mere paper review of the pleadings, or of the parties' motion submissions.

---

[9] Assuming the total of eighteen units corresponding to the named plaintiffs is correct, it appears that a majority of the thirty-two non-developer units are owned by persons who favor assuming control of the association, although they apparently have not taken a formal vote on the question.

[10] We need not ponder here whether a single "gadfly" unit owner could foist control under the statute upon otherwise unwilling owners, where a developer has not been constructing or marketing units in the ordinary course of business.

Defendants, as we have already noted, strongly dispute plaintiffs' claim that the units have not been advertised in the ordinary course of business. That dispute should be resolved by the trial court, after appropriate discovery on the question has been completed. See State v. Gaitan, 209 N.J. 339, 381 (2012) (noting the potential necessity of a plenary hearing to resolve factual issues disputed in the parties' written submissions); see also Bruno v. Gale, Wentworth & Dillon Realty, 371 N.J. Super. 69, 76-77 (App. Div. 2004). Given the passage of time while this appeal has been pending, the trial court should examine the current circumstances, rather than perform a retroactive evaluation of what had existed several years ago when the complaint was filed.[11] See N.J.S.A. 46:8B-12.1(a) (expressing the proviso, in the present tense, in terms of whether units "are being constructed or offered for sale by the developer in the ordinary course of business" (emphasis added)).

The trial court's dismissal of Count I is consequently reversed. On remand, the factual issues under N.J.S.A. 46:8B-12.1(a) relating to Count I should be resolved in the trial court.

---

[11] It is undisputed that plaintiffs have yet to attain the seventy-five percent ownership milestone that would enable them to obtain a transfer of total control under the lock-step mechanism in N.J.S.A. 46:8B-12.1(a) and N.J.A.C. 5:26-8.4(a)(3).

**[At the direction of the court, the published version of this opinion omits Parts II(C), (D), and (E), which address issues distinct from the control issues pleaded in Count I. See R. 1:36-3.]**

III.

The orders dismissing plaintiffs' complaint and denying reconsideration are consequently reversed, on the terms and conditions we have set forth in this opinion. The trial court shall conduct a case management conference with counsel within thirty days. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION